**Affirmed and Opinion filed August 9, 2016.**



In The

# Fourteenth Court of Appeals

## NO. 14-15-00483-CR

**STEPHEN NOAH DAWKINS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 178th District Court
Harris County, Texas
Trial Court Cause No. 1331874**

## O P I N I O N

Appellant Stephen Noah Dawkins was indicted for capital murder, found guilty by a jury, and sentenced to life in prison. In one issue, the appellant contends that the evidence was insufficient to support his conviction for the offense of capital murder. We affirm.

## FACTUAL BACKGROUND

In December 2011, the complainant, Altovise Mahone, was a twenty-seven-year-old woman who was working as a respiratory therapist at the West Houston Medical Center. Altovise also began casually dating the appellant.

Altovise had a close relationship with her family. About two months earlier, Altovise's father had purchased a red 2002 Impala vehicle for her.

After Altovise's apartment was burglarized, she moved into a more secure apartment and purchased a flat-screen television and a Blu-ray DVD player. The appellant helped Altovise set up her television on a stand in the living room of her new apartment. According to Altovise's good friend, Mozelle Carter, Altovise seemed happy to be with the appellant and there were no signs of animosity between them.

Mozelle saw Altovise and the appellant together on December 22, behaving like a couple. On December 27, Altovise asked Mozelle if she wanted to play pool with her and the appellant, but Mozelle declined. Around that time, Mozelle and Altovise had planned to make arrangements to switch cars on December 30 so that Mozelle's fiancé could use Altovise's Impala for a driving test, because the tint on Mozelle's car was too dark.

On December 30, Mozelle attempted to call and text Altovise about switching cars, but she received no response. That evening, Altovise did not report to work as scheduled. When Mozelle still had not heard from Altovise on December 31, she began searching for her.

Meanwhile, Erron Mahone, Altovise's brother, found the appellant through Altovise's Facebook page. Erron sent the appellant a message, and he responded. The appellant claimed that he and Altovise had gone to the movies and the last

time he had heard from her was two days earlier. The appellant also said that Altovise was busy at work until New Years and that she had said something about "going to see her ex." Erron and the appellant communicated back and forth a few times, but the appellant eventually quit responding.

After speaking with Erron, Mozelle thought that Altovise might be at the apartment where the appellant was staying, so she went there and drove around to see if she could locate either Altovise or the appellant. She saw a red Impala that looked like Altovise's car, but with some differences. The car had more scratches, the windows were now tinted, and it now had a spoiler. Mozelle wrote down the license plate number and returned home.

Altovise's parents also became concerned when Altovise's phone went straight to voicemail. On December 31, they decided to go to her apartment. They knocked on her door, but no one answered. Noticing that Altovise's Impala was not there, Altovise's parents drove to her workplace but did not find her. They then went back to her apartment and called the emergency maintenance number to get in. Once inside, they found Altovise's body lying on the floor in the bedroom.

The front door of the apartment showed no signs of forced entry. In the living room, a remote control, still in the package, was on the sofa. A Styrofoam packing piece was in the corner. An empty flat-screen television box sat along the wall near a television stand in front of the fireplace, but there was no flat-screen television in the room. Nor was Altovise's purse, wallet, apartment keys, cellphone, credit card, or cash found in the apartment. In the bathroom, a hammer with blood and hair on it was placed near the sink.

In the bedroom, Altovise's naked body was lying near the closet door. Detective Waters of the Houston Police Department's homicide division was dispatched to the scene, where he observed multiple blows to Altovise's body,

primarily to her head. Based on the blood around the room and how her body lay, Detective Waters believed that the attack started on the bed, and the attacker repeatedly struck Altovise with the hammer as she tried to move away from him.

On the evening of December 29, Patrick Williams, the appellant's friend, got a text from the appellant at a new cellphone number. The appellant told Patrick that he "got his car back" and asked if Patrick wanted to go for a ride with him. On December 31, the appellant and Patrick made plans to go to a nightclub for New Year's Eve. The appellant told Patrick that in preparation for going out that night, he had gotten a haircut and some new shoes.

That same evening, at the request of police, the appellant voluntarily came to the police station with his father and brother to give a statement. While the interview was being conducted by another investigator, Detective Waters looked at the contents of the appellant's cellphone, which the appellant said he had bought on December 29. Altovise's name was not in the contacts list on the cellphone.

When Patrick called the appellant around 10:00 p.m. looking for him, Detective Waters picked up the appellant's phone and identified himself. Detective Waters told Patrick that the appellant was involved in a homicide investigation into the death of a female, but he did not provide any details. Detective Waters later returned the cellphone to the appellant.

During the appellant's interview, at various times he said he had last seen Altovise on December 28, 29, or 30. According to the appellant, Altovise had let him borrow the Impala, but later he gave the car to someone named John Smith. The appellant had no address or phone number for Smith. The appellant also stated that the flat-screen television and DVD player that had been in Altovise's apartment were Christmas presents from Altovise, and they were currently in his brother's apartment where he was staying. The appellant denied that Altovise had

4

given him her keys or a credit card. At the conclusion of the interview, the appellant left the police station.

Later that night, Patrick again called the appellant to ask what was going on. The appellant denied any involvement in a homicide, but he said that "two dudes" were involved. When the appellant went to the nightclub with Patrick, he offered to pay for parking and the entrance fee; he also pulled out a wad of cash. While walking into the club together, the appellant told Patrick that "two dudes set her up and that they asked him for an address." The appellant explained that the "two dudes" offered to give him the Impala in exchange for Altovise's address, so he gave it to them. When Patrick pressed him about why he would do that, the appellant explained, "Man, it's a free car." The appellant declined to tell Patrick where the car was currently located.

Police later recovered a flat-screen television, Blu-ray DVD player, and a cellphone at the apartment where the appellant was staying. The DVD player was in a box missing a Styrofoam piece and the remote control. The cellphone was one the appellant had been using before he purchased the new one he brought with him to the police station.

Detective Waters ran the license plate number Mozelle had written down through a database and it came back as Altovise's Impala. On January 10, 2012, the Impala was found not far from where the appellant had been staying, at an apartment complex where the appellant's estranged wife lived.

Inside the car, police found a newly installed radio with packaging film still on the remote control. The box for the radio was in the trunk. In the center console were Altovise's keys, the card for her apartment complex's security gate, and her driver's license. Also found in the car were items that did not belong to Altovise, including a Macy's bag with a pair of jeans, a bag for Sheikh Shoes, another empty

shopping bag, an empty Air Jordan box, and receipts from Sheikh Shoes and Macy's. Altovise's purse was found in the trunk, but there was no wallet and no credit cards in it. Keys to her family's homes were also in the trunk.

Detective Waters also obtained a copy of Altovise's Wells Fargo bank records, which included the transaction history on her credit and debit cards. The records for Altovise's checking account showed that on December 27, a deposit was made for $2,077.02, and it was gone by 3:10 p.m. on December 31. Beginning at 12:33 p.m. on December 29, there was an ATM withdrawal; a trip to Green's Liquor, which also sells cellphones; two separate purchases at Master Car Stereo Plus; multiple ATM withdrawals and balance checks; a purchase at Macy's; a purchase at Sheikh Shoes; and purchases at a few other shops.

Master Car Stereo Plus employee Danny Ivanov provided copies of invoices dated December 29 and 30, prepared for Stephen Dawkins in reference to an "02 Impala." Among the items the appellant bought for the car were a spoiler, tinted taillights and a new stereo. Ivanov remembered the appellant because the transactions were unusual in that the appellant did not want the spoiler painted and he did not mind that it was scratched.

Altovise's bank records also showed a 9:42 p.m. purchase on December 30 for $27.56 at Wal-Mart. Wal-Mart provided a corresponding receipt of this purchase, which included the last four digits of Altovise's account. A person who looked like the appellant was seen on video and still photographs purchasing the items on the receipt. He was also wearing a jacket similar to the one the appellant wore during his interview. The parking lot surveillance camera showed the person walking up to a red vehicle with a different colored spoiler on the back.

Police also analyzed the cellphone recovered from the apartment where the appellant was staying. The contact information on the phone spanned from

December 15 through December 29, 2011. The conversations between the appellant and Altovise were consistent with a growing relationship. On December 27, the appellant and Altovise exchanged texts reflecting that Altovise was anxious to receive her paycheck. Altovise also discussed the amount of money she preferred to have available in her checking and savings accounts, explaining that she would have "anxiety attacks" if she did not have at least $1,000.00 in checking and $3,000.00 in savings. Later that day, Altovise texted the appellant that she was about to get her paycheck.

Phone records showed that the appellant communicated with at least ten different women in addition to Altovise during December 2011. Altovise was the only one, however, whose contact information was not transferred to the appellant's new cellphone.

The autopsy on Altovise's body showed eighteen to twenty impacts located on the front, top, sides, and back of her head. The injuries were consistent with having been caused by the hammer found in her apartment. Although the date of death could not be pinpointed, the decomposition of the body indicated that Altovise could have died on December 29. The cause of Altovise's death was blunt head trauma, and the manner of death was homicide.

The appellant was indicted for capital murder. At trial, the State did not seek the death penalty. The jury was instructed on the offense of capital murder and the lesser offense of murder. The jury found the appellant guilty of capital murder, and the trial court accordingly sentenced him to life imprisonment without parole.

## Sufficiency of the Evidence

On appeal, the appellant contends that the evidence is insufficient to support his conviction for capital murder. Specifically, the appellant argues that the

7

evidence is insufficient to show that he (1) murdered Altovise, (2) committed a robbery, or (3) murdered Altovise in the course of committing a robbery.

### *Standard of review*

In determining whether the evidence is legally sufficient to support a conviction, we view the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences from it, whether any rational fact finder could have found the elements of the offense beyond a reasonable doubt. *Padilla v. State*, 326 S.W.3d 195, 200 (Tex. Crim. App. 2010); *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011). The jury is the sole judge of the weight and credibility of the evidence. *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011); *see Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010) (appellate court may not substitute its judgment for that of the fact finder). Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015).

A person commits capital murder if he intentionally causes the death of an individual in the course of committing or attempting to commit robbery. *See* Tex. Penal Code § 19.03(a)(2).[1] As used in section 19.03(a)(2), "in the course of committing" the offense means "conduct occurring in an attempt to commit, during the commission, or in the immediate flight after the attempt or commission of the

---

[1] A person commits robbery if, in the course of committing theft and with the intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another or intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. Tex. Penal Code § 29.02(a)(1)–(2). Theft is the unlawful appropriation of property with the intent to deprive the owner of the property. Tex. Penal Code § 31.03. Appropriation of property is unlawful if it is without the owner's effective consent. *Id.* § 31.03(b)(1).

offense." *Robertson v. State*, 871 S.W.2d 701, 705 (Tex. Crim. App. 1993); *McGee v. State*, 774 S.W.2d 229, 234 (Tex. Crim. App. 1989). For a murder to qualify as capital murder, the intent to rob must be formed prior to or concurrent with the murder. *Robertson*, 871 S.W.2d at 705.

Proof that the robbery was committed as an afterthought and unrelated to the murder is not sufficient. *Herrin v. State*, 125 S.W.3d 436, 441 (Tex. Crim. App. 2002); *see White v. State*, 779 S.W.2d 809, 815 (Tex. Crim. App. 1989) (explaining that the point at which the appellant formulated his intent is critical to differentiating between the commission of capital murder in the course of a robbery or a lesser offense). The State must prove that the murder occurred to facilitate the taking of the property. *Moody v. State*, 827 S.W.2d 875, 892 (Tex. Crim. App. 1992); *Ibanez v. State*, 749 S.W.2d 804, 807 (Tex. Crim. App. 1986).

The Court of Criminal Appeals has repeatedly held that the requisite intent may be inferred from the actions or conduct of the appellant. *See Robertson*, 871 S.W.2d at 705; *McGee*, 774 S.W.2d at 234; *Fierro v. State*, 706 S.W.2d 310, 313 (Tex. Crim. App. 1986); *Johnson v. State*, 541 S.W.2d 185, 187 (Tex. Crim. App. 1976). In this case, then, we must determine whether any rational fact finder could have found beyond a reasonable doubt from the direct and circumstantial evidence as a whole that the appellant murdered Altovise and that he formed the intent to take Altovise's property prior to or concurrent with her murder. *See Robertson*, 871 S.W.2d at 705; *White*, 779 S.W.2d at 815.

### *Analysis*

Bearing in mind the applicable standard of review, we turn to the appellant's assertions that the evidence is insufficient to support his conviction for capital murder.

## 1.    Sufficiency of the evidence that the appellant murdered Altovise

The appellant concedes that Altovise was murdered, but argues that there was no direct physical evidence to connect him to Altovise's murder, no witnesses or other evidence to place him in Altovise's apartment at the time of her death, and no physical evidence to directly connect him to the murder or the murder weapon. The appellant points out that the small amount of DNA found on the hammer could not be analyzed to determine whether it matched the appellant's DNA.

Despite a lack of direct physical evidence, substantial circumstantial evidence was presented from which a rational jury could have found that the appellant murdered Altovise. It is undisputed that the appellant was in a dating relationship with Altovise, and the evidence at the scene of the crime showed that Altovise was murdered by someone she knew intimately. The door showed no signs of forced entry. An old television in Altovise's bedroom was on, there was evidence that the attack started on the bed, and Altovise was found lying naked on the bedroom floor.

The appellant's own statements to police and his friend, Patrick, further implicate him in the murder. The appellant admitted to being with Altovise prior to her death, having her car, and having other items from her apartment. At various times during the interview, the appellant placed himself at Altovise's apartment on the day of her death. Additionally, Patrick testified that the appellant told him that he gave two men Altovise's address in exchange for her car, a story either implausible or indicative of the appellant's venal character. As the sole fact finder, the jury was entitled to consider the appellant's inconsistent and contradictory statements to police and Patrick, as well as the appellant's actions before and after the murder, in finding that the appellant murdered Altovise. *See Adames*, 353 S.W.3d at 860; *Isassi*, 330 S.W.3d at 638.

## 2. Sufficiency of the evidence that the appellant robbed Altovise

The appellant also argues that while the State offered evidence that the appellant was in possession of Altovise's Impala and other property, the State failed to "fully rebut" his claims that she had given him the property as gifts or loaned the Impala to him. Appellant points to testimony that Altovise was a generous person, that she had been Christmas shopping with the appellant near the time of her death, and that she had even bought a gift for Mozelle's fiancé. The appellant argues that this evidence is consistent with his claims that Altovise, who was in an intimate relationship with the appellant, loaned him the Impala and gave him the television and DVD player as Christmas gifts. We disagree with the appellant's characterization of the evidence.

The State presented evidence that the appellant liked to have nice things—including clothes, shoes, cars, and money.[2] But in December 2011, the appellant did not have a job or a car. The appellant also knew that Altovise was about to receive her paycheck. A couple of days before she was killed, Altovise told the appellant exactly how much money she liked to keep in her bank accounts. The appellant had also helped Altovise set up her new television.

Mozelle testified that Altovise bought the new television and Blu-ray DVD player for herself, not the appellant. Further, the television stand in Altovise's apartment was left empty. The box for the television was still in Altovise's apartment, along with a piece of Styrofoam wrapping and the remote control to the DVD player. Given Mozelle's testimony and the fact that some of the packaging and accessories were still at Altovise's apartment, the jury reasonably could have

---

[2] For example, Patrick testified that having a car was important to the appellant, and that he liked "clothes, cars, and money." The appellant's estranged wife also testified that the appellant liked "nice clothes, nice shoes, nice everything."

11

concluded that the television and DVD player were not intended as Christmas gifts.

Concerning the Impala, the appellant claimed that Altovise had loaned the car to him, yet he made various modifications to the car on December 29 and 30. The appellant then claimed to have loaned it to a John Smith, whose real name and address he did not know. The jury could have reasonably concluded these actions were inconsistent with merely borrowing a car. The State also presented evidence that Mozelle was supposed to switch cars with Altovise on the morning of December 30, and Altovise was supposed to go to work that evening, indicating that Altovise needed the car for her own use. Further, Mozelle testified that Altovise would not have allowed the appellant to borrow her car to drive by himself. On December 29, however, the appellant told Patrick that he "got his car back" and wanted to take him for a ride. The appellant also made a point of paying for Patrick at the nightclub, and he flashed a large wad of cash in front of Patrick. And, whether plausible or not, the appellant admitted that he wanted a "free car" when he told Patrick that two men had killed Altovise and he had gotten the car in return.

When Mozelle went looking for Altovise, she saw the Impala at the apartment complex where the appellant was staying. Police found the car a few days later at a different apartment complex where the appellant's estranged wife lived. Inside the car were shopping bags and receipts from the places Altovise's bank card had been used, along with her keys, her purse, and her driver's license. The appellant was also on surveillance video at Wal-Mart using Altovise's bank card and driving the car. Based on this and the other evidence detailed above, we conclude that the evidence is more than sufficient to enable the jury to rationally conclude that the appellant robbed Altovise of her possessions, her money, and her car.

### 3. Sufficiency of the evidence that the appellant murdered Altovise in the course of committing a robbery

Finally, the appellant argues that even if he murdered Altovise, there is no proof beyond a reasonable doubt that he did so with the specific intent—formed either before or concurrent with the murder—to obtain her property. According to the appellant, "[i]t is just as likely from the evidence presented at trial that [Altovise] was killed, and that sometime after her death—and separate and apart from her murder—Appellant decided to take the property, which would not support a conviction for capital murder."

We conclude that the State presented more than sufficient evidence from which the jury reasonably could have found that the appellant intended to rob Altovise either before or concurrent with her murder. The appellant, who had a penchant for nice things, knew before the murder that Altovise had money in her accounts and had just deposited a paycheck. The appellant's own statement places him with Altovise on the day of the murder and driving her car. And, within hours of the murder, he bought a new cellphone and began a three-day spending spree. There was no evidence that the appellant was angry at Altovise or that there was anything wrong in the relationship to support a different motive for the murder.

Viewing the evidence as a whole and in the light most favorable to the verdict, a rational jury could have inferred from the evidence that the appellant killed Altovise for her money. *See Robertson*, 871 S.W.2d at 705 (stating that intent may be inferred from the actions or conduct of appellant); *McGee*, 774 S.W.2d at 234 (same); *see also Hall v. State*, 970 S.W.2d 137, 141–42 (Tex. App.—Amarillo 1998, pet. ref'd) (holding that evidence of a murder coupled with a contemporaneous robbery was legally sufficient to support capital murder conviction). We overrule the appellant's sole issue.

13

## CONCLUSION

We overrule the appellant's issue and affirm the trial court's judgment.


/s/  Ken Wise
    Justice


Panel consists of Justices Busby, Donovan, and Wise.
Publish — TEX. R. APP. P. 47.2(b).