**Affirmed and Memorandum Opinion filed October 30, 2018.**



**In the**

# Fourteenth Court of Appeals

## NO. 14-17-00129-CR

**MICHAEL ANTHONY SMITH, Appellant**

**v.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 174th District Court
Harris County, Texas
Trial Court Cause No. 1430835**

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Michael Anthony Smith of capital murder. *See* Tex. Penal Code § 19.03 (West 2018). Appellant challenges his conviction, arguing that the trial court erred by failing to define "in the course of," as applied to capital murder, in the jury charge. Appellant also argues that the evidence was legally insufficient to prove he formed the requisite intent to rob complainant. We affirm.

# I.    BACKGROUND

Complainant Tetrick Moffett-Brown, known as "Chico," often stayed at the Northgate Inn and Suites in Houston, Texas with a prostitute, Chasity Winters. Winters allowed complainant to sell drugs out of her hotel room. On May 21, 2014, complainant and his friend Niko Boyd were "chilling at the hotel" when Boyd told complainant that appellant had a gun; Boyd had "heard [appellant] talking about" the gun. Complainant drove with Winters and another woman called "Lady" to purchase the gun from appellant. When they arrived at their destination, Winters and Lady stayed in the vehicle while complainant got out of the vehicle and "went to a truck." Complainant returned to the vehicle with a gun. Complainant then drove back to the hotel and resumed "chilling at the hotel" with Boyd. While complainant was "chilling" with Boyd, appellant came to the hotel and asked complainant for his gun. Complainant and Boyd subsequently left the hotel to go to complainant's girlfriend's house.

The same night, appellant returned to Winters' hotel room and forced the door open. Winters had never met appellant before. Appellant waived a gun in her face, demanding to know where complainant was, searching the room, and asking for "the money." Appellant told Winters to call complainant. Winters called but got no answer. Winters then had sex with appellant to "lighten the mood." She fell asleep afterwards. At some point, appellant wiped everything in the room he had touched with a denim jacket he was wearing.

When Winters woke up the next morning, appellant was no longer in the room. Winters looked at her phone and noticed she had missed a call from complainant. She called him back. Complainant asked what she was doing and she said, "nothing." As she was getting off the phone with complainant, she heard a knock at the door. Winters answered the door and let appellant in. When he came

2

in, he had a gun in his hand. Appellant began putting on gloves, and as he was doing so, complainant knocked at the door. Appellant opened the door and stepped outside to meet complainant. Winters saw[1] and heard a gunshot, then ran to hide in the restroom. Winters heard more gunshots. Winters called the police and exited the restroom. Appellant was still outside of her hotel room door. Appellant left the hotel before police arrived. After he left, appellant called Winters to confirm complainant was dead.

A few doors down, two brothers staying in the hotel also heard the gunshots. Dwayne Norman was staying with his brother Luis Revelo on the morning of May 22, 2014, when the murder occurred. When the brothers initially heard the gunshots, they believed them to be fireworks. Then they looked out the window and saw one person standing over another person. Norman heard one person ask, "Where my stuff? Where my stuff?" The other person responded, "I don't know. I don't know. I ain't got it. I ain't got it." Revelo heard one person say, "Give me my money. Give me my money," and the other person respond, "I don't have any money." Then the brothers heard more gunshots. When "everything calmed down," they opened the door and saw "a guy standing over another guy." Norman and Revelo identified the man on the ground as complainant. Revelo saw the person standing over complainant was holding a gun. Norman heard complainant saying, "I don't have it. I don't have it." Norman and Revelo observed that the shooter, like appellant, had a full, thick beard. When the brothers peeked out the door, the shooter pointed the gun at them. Norman and Revelo went back in the room and shut the door. Back in the room, Norman looked out the window and closed the curtain. Then he heard

---

[1] At trial, Winters initially testified that she did not see appellant shoot complainant because "the door was being closed." She later testified she saw appellant take the first shot: "I seen him shooting because he was standing in the door when he shot him; and the door was closing behind him. I saw the first shot. I didn't see the other shot."

3

more gunshots. The brothers looked out the window again and saw a blue Infiniti driving away. Both Norman and Revelo recognized the vehicle driving away as complainant's vehicle. The Infiniti belonged to complainant's girlfriend, but it had been in complainant's possession as he frequently drove the vehicle. Revelo testified, "And once I looked out the window, I see the man's car driving off. Chico, the victim, his car is driving off; but he's not in the car. He's on the floor dying." Revelo noticed a gloved hand on the steering wheel. Norman ran outside to complainant and asked him if he was "all right." Complainant did not respond. Complainant died from his gunshot wounds.

Appellant left town with his girlfriend in her vehicle sometime after 2:00 p.m.[2] the same day. They drove toward Colorado. In the early morning hours of May 23, 2014, a police officer observed appellant disregard a stop sign in Amarillo, Texas. The Amarillo officer stopped the vehicle. When the officer asked for appellant's name and date of birth, appellant gave the officer his name but an incorrect date of birth. Appellant was arrested for "Failure to ID" and transported to county jail. At the jail, the clothing appellant was wearing, including a denim jacket, was documented in photographs. In appellant's first phone call after his Amarillo arrest, he told his girlfriend, "We was on the road at seven, you hear me?" The murder of complainant had taken place at approximately 8:00 a.m.

Meanwhile, Sergeant Miller of the Harris County Sheriff's Office Homicide Unit investigated complainant's murder in Houston. As part of his investigation, Miller interviewed Winters, Norman, and Revelo. Winters described appellant's visits to her room and the shooting. Winters identified appellant in a photo array.

---

[2] Phone records showed that appellant's girlfriend's phone remained in Houston at 2:00 p.m. on May 22, 2014. At approximately 3:25 p.m. on May 22, 2014, appellant's girlfriend's phone was between Huntsville and Madison, Texas. At approximately 6:00 p.m. on May 22, 2014, appellant's girlfriend's phone was in the Dallas/Fort Worth area.

Norman and Revelo described their observations.  Miller also obtained surveillance footage which showed the shooting.

At trial, Miller testified about the footage:

Q.    What sort of actions do you see up here by the room at this point after the complainant you see drops?

A.    Well, at this point, he's on the landing now.  The guy that got out of the car and went up to the room and was standing outside the door for a minute, then he comes up here and you see him drop.

And then you will see somebody exit room 216.  He points down, down the landing.  You see a couple people peak [sic] out of 214, and then he then [sic] looks like he's discharging rounds into the guy on the landing.

Miller also testified that the footage showed the shooter was wearing what appeared to be a blue or denim jacket.

Complainant's girlfriend's blue Infiniti was found unoccupied and parked on May 23, 2014, in a residential area less than a mile from appellant's girlfriend's home.  The interior of the vehicle had been bleached.

Appellant was charged with capital murder by intentionally causing complainant's death in the course of committing and attempting to commit robbery. *See* Tex. Penal Code § 19.03(a)(2).  The jury convicted appellant, and the trial court sentenced appellant to life imprisonment in the Texas Department of Criminal Justice – Institutional Division. *See* Tex. Penal Code § 12.31(a)(2) (West 2017).  Appellant timely appealed.

## II.    ANALYSIS

## A.    Sufficiency of the evidence

In his second issue, appellant asserts the evidence is insufficient to support his conviction for capital murder because it does not show he formed the intent to rob complainant before or during the commission of the murder. We begin with this issue because, if sustained, it would afford appellant the greatest relief. *See* Tex. R. App. P. 43.3; *Jones v. State*, 531 S.W.3d 309, 315 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd).

### 1.    Standard of review and applicable law

When reviewing the sufficiency of the evidence to support the jury's guilty verdict in a criminal case, we consider whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis original); *see Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). Under this standard, "*all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson*, 443 U.S. at 319 (emphasis original).

"[C]ircumstantial evidence is as probative as direct evidence in establishing the guilt of the actor, and circumstantial evidence alone may be enough to establish guilt." *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013). The jury is permitted "to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial." *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007).

"Although we consider everything presented at trial, we do not reevaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder." *Price v. State*, 456 S.W.3d 342, 347 (Tex. App.—Houston [14th Dist.]

2015, pet. ref'd) (citing *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)). The jury is the sole judge of the weight and credibility of the evidence. *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011); *see Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010) (appellate court may not substitute its judgment for that of fact finder). "The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt." *Jones*, 531 S.W.3d at 315.

A person commits capital murder if he intentionally causes the death of an individual in the course of committing or attempting to commit robbery.[3] *See* Tex. Penal Code § 19.03(a)(2); *Dawkins v. State*, 495 S.W.3d 890, 895 (Tex. App.—Houston [14th Dist.] 2016, no pet.). As used in section 19.03(a)(2), "in the course of committing" the offense means "conduct occurring in an attempt to commit, during the commission, or in the immediate flight after the attempt or commission of the offense." *Robertson v. State*, 871 S.W.2d 701, 705 (Tex. Crim. App. 1993); *see McGee v. State*, 774 S.W.2d 229, 234 (Tex. Crim. App. 1989).

For a murder to qualify as capital murder, the intent to rob must be formed before or during the murder. *Robertson*, 871 S.W.2d at 705. Proof that the robbery was committed as an afterthought and unrelated to the murder is not sufficient to prove capital murder. *Dawkins*, 495 S.W.3d at 895 (citing *Herrin v. State*, 125 S.W.3d 436, 441 (Tex. Crim. App. 2002), and *White v. State*, 779 S.W.2d 809, 815 (Tex. Crim. App. 1989)). However, evidence is legally sufficient to prove the intent

---

[3] A person commits robbery if, in the course of committing theft and with the intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another or intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. Tex. Penal Code § 29.02(a) (West 2018). Theft is the unlawful appropriation of property with the intent to deprive the owner of the property. Tex. Penal Code § 31.03(a) (West 2018). Appropriation of property is unlawful if it is without the owner's effective consent. *Id.* § 31.03(b)(1).

to rob if "the jury could rationally conclude beyond a reasonable doubt that the defendant formed the intent to obtain . . . the victim's property either before or during the commission of the murder."  *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001).

A jury may infer the requisite intent from the words or conduct of the appellant.  *Id.*; *McGee*, 774 S.W.2d at 234.  Evidence showing a theft occurred immediately after a murder will support an inference that intent to rob was formed before or during the murder.  *See McGee*, 774 S.W.2d at 234 ("We have held numerous times that this aggravating element is sufficiently proven if the State proves the robbery occurred immediately after the commission of the murder").  Even if there is no other evidence that the defendant formed the intent before or during the murder, this inference alone will support a conviction.  *See Cooper v. State*, 67 S.W.3d 221, 223–24 (Tex. Crim. App. 2002) ("The *absence* of additional evidence will not defeat the natural inference allowed by *McGee*.").

## 2.    Sufficient evidence

Appellant contends the evidence is insufficient to support his conviction for capital murder because it does not show he formed the intent to rob complainant before or during the commission of complainant's murder.  In support of this argument, appellant compares his case to *Herrin v. State*, 125 S.W.3d 436 (Tex. Crim. App. 2002), a case in which the defendant's capital murder conviction was overturned because the evidence was legally insufficient to support the jury's verdict that he committed murder while in the course of committing robbery or attempted robbery.  Appellant asserts the "two cases are so similar as to be almost interchangeable."  Appellant argues the evidence in his case did not give rise to a reasonable inference that he intended or attempted to rob complainant.  Appellant contends that although the State suggested and argued at trial that appellant intended

8

to steal from complainant, the evidence did not support these suggestions and arguments. We disagree.

*Herrin* is distinguishable from the facts of this case. In *Herrin*, the Court of Criminal Appeals held that evidence of the defendant's belief that the decedent owed him money, coupled only with the fact that the decedent's wallet was missing, was insufficient to prove an intent to rob. *See* 125 S.W.3d at 442–43. Here, by contrast, there is ample evidence that appellant intended to rob complainant. The night before the murder, appellant was looking for complainant, waiving a gun around, and asking for "the money." During the shooting, appellant asked complainant, "Where's my stuff?" and demanded, "Give me my money." In addition, significant circumstantial evidence existed to support the reasonable inference that appellant drove away from the shooting in complainant's girlfriend's Infiniti: the Infiniti drove away right after the shooting; neither complainant nor his girlfriend was driving the vehicle; appellant was wearing gloves and Revelo observed a gloved hand on the steering wheel of the vehicle as it was driving away; the vehicle was found within a mile of appellant's girlfriend's house and appellant left town with his girlfriend; and when the vehicle was found, its interior had been bleached. This evidence is sufficient for a rational jury to find beyond a reasonable doubt that appellant formed the requisite intent to rob complainant before or during the murder. *See Conner*, 67 S.W.3d at 198 (evidence sufficient to prove defendant's attempt to rob when witness heard man say, "[g]ive me all your money" and saw defendant shoot decedent, although there was no evidence that money was taken from decedent's cash register).

Viewing all the evidence in the light most favorable to the verdict, a rational jury could have found beyond a reasonable doubt that appellant intentionally caused the death of complainant in the course of robbing him. *See McGee*, 774 S.W.2d at 234; *Dawkins*, 495 S.W.3d at 898. We overrule appellant's second issue.

9

**B.     Definition in jury charge**

In his first issue, appellant contends that the trial court failed to provide a definition of "in the course of" with respect to capital murder in the jury charge. Although appellant concedes he did not request any definition in this regard or object to its omission, he argues that the omission requires reversal because the failure to include it in the charge caused him egregious harm.

**1.     Standard of review**

The review of alleged jury-charge error is a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). First, we examine the jury charge to see if the trial court erred. *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009). Second, if we find that the trial court erred, we must determine if the harm is sufficient to warrant reversal. *See Celis v. State*, 416 S.W.3d 419, 423 (Tex. Crim. App. 2013). Where no timely objection was made, error will not require reversal unless the error is so egregious that appellant was not given a fair and impartial trial. *Barrios*, 283 S.W.3d at 350. If we do find error in the jury charge, we must review the entire record to determine whether appellant suffered egregious harm. *Sanchez v. State*, 209 S.W.3d 117, 121 (Tex. Crim. App. 2006). An error in the jury charge is egregious if "it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Id.*

**2.     "In the course of"**

Appellant argues that "both the capital murder statute and the robbery statute require the named offense to be committed 'in the course of' another offense" but the phrase "'in the course of' . . . is defined more broadly for robbery than capital murder." Appellant correctly states that for robbery, section 29.01(1) of the Texas Penal Code defines "in the course of committing theft" as follows: "'In the course

10

of committing theft' means conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft." According to appellant, the definition of "in the course of" as it is applies to capital murder is narrower. Appellant points out that for an alleged murder to occur "in the course of" robbery, the defendant's intent to rob must be formed before or during the murder. Appellant argues the jury charge was misleading because it defined "in the course of committing theft" but did not define "in the course of committing or attempting to commit the offense of robbery." According to appellant, "[t]his omission results in a misstatement of the law because it does not inform jurors that a murder is committed 'in the course of' robbery only if the defendant formed an intent to rob before or during the offense, not in the immediate flight from it."

Appellant's arguments are incorrect. "In the course of" is not defined more broadly for theft underlying robbery than for robbery underlying capital murder. The Court of Criminal Appeals and this court have defined "in the course of" as it applies to conduct underlying capital murder in the exact same manner the Penal Code defined "in the course of" as it applies to theft underlying robbery: "Under section 19.03(a)(2) of the Penal Code, 'conduct occurring in an attempt to commit, during the commission, or in the immediate flight after the attempt or commission of the offense' is conduct that occurs 'in the course of committing' the offense." *Jones*, 531 S.W.3d at 315 (quoting *Robertson*, 871 S.W.2d at 705). Appellant is correct that for a murder to qualify as capital murder, the intent to rob must be formed before or during the murder, but the definition of "in the course of" refers to when the conduct, i.e., the robbery, took place, not when the intent to rob was formed. Because the definition of "in the course of" is the same for both the underlying robbery and for capital murder, and because neither of these definitions includes a definition of intent, we reject appellant's argument that the jury charge was

11

misleading or included a misstatement of the law.

Moreover, it is generally impermissible for the trial court to define terms in the jury charge that are not statutorily defined. *Green v. Texas*, 476 S.W.3d 440, 445 (Tex. Crim. App. 2015). Code of Criminal Procedure article 36.14 requires that jury instructions be limited to setting forth the applicable law, and definitions for terms that are not statutorily defined are not considered to be "applicable law" under article 36.14. *Green*, 476 S.W.3d at 445.

Appellant argues that even though the definition he seeks was non-statutory, it should have been included because its omission "was material to this case, given the State's lack of evidence that Appellant intended to rob Chico." Appellant suggests the jury would not have been able to consider the theft of the Infiniti as evidence of appellant's intent to rob if the jury charge had "informed them that capital murder 'in the course of' robbery does not include conduct occurring in the immediate flight from an offense." We disagree.

We concluded above that sufficient evidence existed that appellant intended to rob Chico. Appellant's suggestion that the jury should have been precluded from considering the theft of the blue Infiniti as evidence of appellant's intent to rob is also incorrect. As explained above, the Court of Criminal Appeals has held that evidence showing a theft occurred immediately after a murder will support an inference that the murder was intended to facilitate robbery. *See McGee*, 774 S.W.2d at 234–35. We conclude the trial court did not err in failing to include an incorrect non-statutory definition in the charge. Because we have determined that the trial court did not err by failing to include the definition, we need not consider appellant's argument concerning egregious harm. We overrule appellant's first issue.

12

## III. Conclusion

Having overruled both of appellant's issues, we affirm the judgment of the trial court.


                                              /s/    Marc W. Brown
                                                     Justice



Panel consists of Justices Busby, Brown, and Jewell.
Do Not Publish — TEX. R. APP. P. 47.2(b).