**Modified and Affirmed and Opinion Filed May 31, 2023**



In The
# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-21-00563-CR

**ANGEL LISANDRO SANCHESZENTENO, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 204th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1770139-Q**

## MEMORANDUM OPINION

Before Justices Reichek, Goldstein, and Kennedy[1]
Opinion by Justice Goldstein

Angel Lisandro Sancheszenteno appeals his capital murder conviction. A jury

found appellant guilty, and the trial court sentenced him to confinement for life

without the possibility of parole. In five issues, appellant argues the evidence was

legally insufficient to prove a nexus between the underlying murder and the theft of

property, the jury charge failed to include a necessary instruction, the court failed to

conduct the polling of the jury, the judgment should be reformed, and the cumulation

---

[1] The Honorable Justice David J. Schenck was originally a member of this panel. The Honorable Justice Kennedy succeeded Justice Schenck when his term expired on December 31, 2022. Justice Kennedy has reviewed the briefs and the record.

order is invalid and should be stricken. In a single cross-issue, the State requests that the judgment be reformed to comport with the record. As reformed, we affirm the trial court's judgment.

## BACKGROUND

On July 26, 2014, Dallas police officer James Etchieson and his partner were called to an apartment in Dallas where "there was a possible family member that was possibly deceased." At the scene, Etchieson discovered the decedent, fifty-five-year-old Martin Ontiveros, on the floor inside the apartment and called other officers to respond. Carmella Nuttroy, a crime scene analyst, came to the scene and took photographs and collected evidence. Among other things, Nuttroy collected a "metal rod" made of "heavy metal" and photographed a pair of tennis shoes with the laces removed. Ontiveros' wrists and ankles were tied with shoelaces, and "some type of sheet" covered his face. A subsequent autopsy revealed that Ontiveros was bound with very tight "complex ligature bindings" that "would have taken somebody time to achieve." Ontiveros' body showed injuries that indicated he had been struck in the head and body multiple times with a "metal rod." Ontiveros' nose and eye orbit were fractured, and one eye was ruptured.

At the scene, police determined that Ontiveros' Land Rover, a television, and a "sword or knife" were missing. The Land Rover was later recovered across the street from appellant's uncle's residence where appellant had been staying. Police recovered Ontiveros' cell phone and determined the last phone call Ontiveros made

or received was from appellant's cell phone. A detective called appellant's phone number, and appellant answered the phone and identified himself as "Angel Sanches." A detective's attempt to arrange a meeting with appellant was unsuccessful.

The case became inactive. Detectives Cayce Shelton and Pedro Trujillano eventually received the case and began reviewing the file. From their review, they determined they needed to speak with appellant. In August 2016, the detectives went to a "facility where [appellant] was located"[2] to speak with him. When the detectives arrived, the staff at the facility gave them a letter from appellant in both the original Spanish and a version translated into English. The letter stated the following:

> My name is Angel. I have had problems because my actions want to come back on me like this.
>
> 1 person I remember who told me that his name was MARTIN SANCHEZ and he lived out by 1-35 in some apartments that are right next to it. I tied him up, I hit him on the forehead with a pipe, and I broke his face and he had a lot of blood coming out of it. Then I stole his things and his car. The police called me like a week later but I broke my cell phone but it wasn't because of Martin. His body, I don't know if it was found, but my conscience is bothering me and I want to take responsibility for his death. He was already older, like about 48 more or less. I hit him and I "rombati" several of his teeth with the pipe, I took pictures of him with my cell phone and then I left.

---

[2] Both appellant and the State mention in their briefs that the "facility" is a prison where appellant was incarcerated. The record contains the State's notice of intent to offer and introduce evidence of 77 extraneous offenses including multiple jail incidents. Among other things, the notice listed appellant's October 2015 life sentences for capital murder of a child under the age of ten and aggravated sexual assault of a child.

–3–

The letter also contained a footnote beside the word "rombati" containing the translator's note: "The original appears to say 'rombati', which is not a word, but somewhat resembles the word 'rompi' (I broke); the writer may have intended 'I broke' or 'I knocked out.'"

Shelton and Trujillano proceeded to meet with appellant and made a video recording of the interview. Trujillano first advised appellant of his Miranda rights, and appellant said he understood his rights and agreed to speak with Trujillano. Appellant described how he met Ontiveros:

> So I met him, he invited us, he invited us to a restaurant to eat, because he was gay, right? So, me and my buddy went to his house, we were drinking and then my buddy left after that. Well, he stayed with me, right? And we didn't have any intercourse, right? Because I almost didn't, I had my girlfriend, all the stuff and that. The dude, the dude tells me he's gay, I left and he gave me a ride, right? Afterward he was sending me texts that, did I want to drink, did I want to take drugs, right?

In response to Trujillano's questioning, appellant gave the following description of the murder:

> So, after that, the dude was sending me messages, he was giving me money, and all the stuff, right? But I was seeing him as a buddy. But one day I had a .45, a pistol, so I went to his house, and he said to me how much would I charge him for, to suck my prick, right? My dick, and suck my ass, right? And I got angry, right? . . . I took out the pistol and I told him to get down on the floor. So, the dude didn't want to lie down, right? And I told him that if he didn't I would kill him. He lay down and I took the shoelaces out of his sneakers, I tied him up to a pipe, a pipe there in/on the door . . . I took it and I started to hit him with the pipe . . . His name was Martin or something like that. . . . I hit him first with the pipe, and the pipe had a sharp point, so I made a hole here in his forehead. A lot of blood started coming out. And that's why I kept hitting him. I hit him more than 40 times. After that, he wasn't

moving, he wasn't moving, right? I touched him here and he wasn't breathing, however, I kept giving it to him to kill him. After that I took all his things and I put them in his car and left.

In response to questioning, appellant clarified that he took a television, a DVD player, and a rifle and left with Ontiveros' car.

When asked about the police calling him after the murder, appellant stated the police called him and said they wanted to talk to him. Although told not to hang up, appellant "hung up and from there I broke the phone and I chucked it off a bridge."

In April 2017, appellant was charged by indictment with capital murder in association with the death of Ontiveros. At trial in July 2021, DNA analyst Courtney Ferreira testified she tested the shoelaces used to bind Ontiveros' wrists and ankles. The shoelace used to bind Ontiveros' wrists contained a sample that was a mixture of two individuals' DNA: Ontiveros was the major contributor and appellant was a minor contributor at a statistical weight of 1 in 100 people. Ferreira testified that, of all people tested, only appellant was included as the potential minor contributor. On the shoelace used to bind Ontiveros' ankles, appellant was included as being a potential contributor, but at the low level of 1 in 2 persons.

FBI Special Agent Mark Sedwick testified he worked with the Cellular Analysis Survey Team since 2014, and he reviewed Ontiveros' and appellant's cell phone records. The two phones began communicating on July 14, 2014. Between that date at 9:14 p.m. and the day of the murder at 8:25 p.m., appellant's phone called

–5–

Ontiveros' phone fifty-five times, with forty-two of those calls going to voicemail. During that same timeframe, the phones exchanged 401 text messages.

Specifically on the day of the murder, Sedwick testified appellant's phone called Ontiveros' phone and the call went to voicemail at 7:35 p.m., and the phones then exchanged ten texts between 7:37 and 8:13. During this time, Ontiveros was using a cell tower near his home where the murder occurred, and appellant was using a cell tower close to his own home nearby. At 8:19 and 8:25, both phones were using the same cell tower to exchange texts and a phone call, which Sedwick testified showed the phones were "basically in the same general area." At 8:25 p.m. on the day of the murder, Ontiveros' cell phone went off the network. From 9:07 to 9:33, appellant's phone continued to use the cell phone tower with a coverage area that included the murder scene.

Although the jury heard evidence of appellant's confessions to murdering Ontiveros, appellant did not testify at trial. The jury charge instructed the jury that a person commits capital murder if he commits the offense of murder by intentionally or knowingly causing the death of an individual, and the murder is committed while in the course of committing or attempting to commit the offense of robbery. The jury found appellant guilty of capital murder, and this appeal followed.

## DISCUSSION

### I. Legal Sufficiency Challenge

In his first issue, appellant argues the evidence was legally insufficient to prove a nexus between the underlying murder and the theft of property. Specifically, appellant asserts that any intent to commit theft arose after he attacked Ontiveros and was therefore part of a separate, distinct offense.

## A. Standard of Review and Corpus Delicti Rule

In reviewing the sufficiency of the evidence, an appellate court must ask whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard gives full play to the responsibility of the factfinder "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* (quoting *Jackson*, 443 U.S. at 319). An appellate court cannot act as a thirteenth juror and make its own assessment of the evidence. *Id.* A court's role on appeal is restricted to guarding against the rare occurrence when the factfinder does not act rationally. *Id.*

It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Id.* Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the

–7–

conviction. *Id.* Because evidence must be considered cumulatively, appellate courts are not permitted to use a "divide and conquer" strategy for evaluating the sufficiency of the evidence. *Id.*

The corpus delicti rule is a judicial rule of evidentiary sufficiency "affecting cases in which there is an extrajudicial confession." *Shumway v. State*, 663 S.W.3d 69, 75 (Tex. Crim. App. 2022) (quoting *Miller v. State*, 457 S.W.3d 919, 925 (Tex. Crim. App. 2015)). It requires that, "[w]hen a conviction is based on a defendant's extrajudicial confession, that confession does not constitute legally sufficient evidence of guilt without corroborating evidence independent of that confession showing that the essential nature of the offense was committed." *Id.* (quoting *Miranda v. State*, 620 S.W.3d 923, 928 (Tex. Crim. App. 2021)). The corpus delicti rule essentially adds an additional requirement to our traditional *Jackson v. Virginia* legal sufficiency analysis for cases involving extrajudicial confessions. *Id.* (quoting *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021)).

Under the corpus delicti rule, the corroborating evidence need not independently prove the crime but must simply make the occurrence of the crime more probable than it would be without the evidence. *Id.* Courts have traditionally applied the corpus delicti rule to ensure that a person is not convicted "solely on his own false confession to a crime that never occurred." *Id.*

In the capital murder context, an extrajudicial confession must be corroborated as to the murder and the underlying felony which elevated the murder

to a capital offense. *Emery v. State*, 881 S.W.2d 702, 705 (Tex. Crim. App. 1994). In other words, the corpus delicti of both the murder and the underlying felony must be shown by evidence independent of the confession. *Id.*

## B. Analysis

A person commits the offense of capital murder, as charged in the instant case, if he commits murder in the course of committing or attempting to commit robbery. TEX. PENAL CODE ANN. § 19.03(a)(2). A person commits robbery if, in the course of committing theft and with the intent to obtain or maintain control of the property, he "intentionally, knowingly, or recklessly causes bodily injury to another." *Id.* § 29.02(a). As used in section 19.03(a)(2), "in the course of committing" the offense means "conduct occurring in an attempt to commit, during the commission, or in the immediate flight after the attempt or commission of the offense." *Dawkins v. State*, 495 S.W.3d 890, 895 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (quoting *Robertson v. State*, 871 S.W.2d 701, 705 (Tex. Crim. App. 1993)).

The defendant's requisite intent to commit the offense may be inferred from his actions or conduct. *Robertson*, 871 S.W.2d at 705. For a murder to qualify as capital murder in this context, the intent to rob must be formed prior to or concurrent with the murder. *Id.* Proof that the robbery was committed as an afterthought and unrelated to the murder is not sufficient. *Herrin v. State*, 125 S.W.3d 436, 441 (Tex. Crim. App. 2002). But, a robbery occurring immediately after a murder will support an inference that the murder was intended to facilitate the robbery. *Padilla v. State*,

–9–

326 S.W.3d 195, 200 (Tex. Crim. App. 2010); *McGee v. State*, 774 S.W.2d 229, 234 (Tex. Crim. App. 1989) ("We have held numerous times that this aggravating element [murder in the course of committing robbery] is sufficiently proven if the State proves the robbery occurred immediately after the commission of the murder.").

Relying on *Ibanez v. State*, 749 S.W.2d 804, 807 (Tex. Crim. App. 1986), appellant argues a killing and unrelated taking of property do not constitute capital murder under 19.03(a)(2); the State must prove a nexus between the murder and the theft, i.e., that the murder occurred in order to facilitate the taking of the property. Appellant asserts "there was insufficient evidence proving that a murder occurred in the course of a robbery or that [appellant] killed so that he could rob." We note the court in *Ibanez* stated that its reference to murder occurring to "facilitate the taking of the property" was "not to be construed as a limitation of this Court's previous holdings that a theft that occurs after the commission of a homicide is sufficient to prove a capital murder." *Id.* at n.5. Thus, *Ibanez* does not support appellant's contention that the State was required to prove the murder in this case "occurred in the course of a robbery" or that appellant "killed so he could rob." *See id.* Instead, the evidence was sufficient to prove capital murder if it showed a robbery occurred immediately after the murder. *Id.* at n.5; *McGee*, 774 S.W.2d at 234.

In his brief, appellant concedes that Ontiveros' Land Rover disappeared after the murder and was recovered in mid-August 2014 across the street from appellant's

–10–

uncle's residence where appellant had been staying. However, applying his erroneous interpretation of *Ibanez*, appellant characterizes this evidence as "evidence that [appellant] took the Land Rover after the killing, not that he killed Ontiveros so that he could rob him." Having rejected appellant's interpretation of *Ibanez*, we conclude the evidence that appellant took Ontiveros' Land Rover immediately after the murder was sufficient to prove capital murder. *See Ibanez,* 749 S.W.2d at 807; *McGee*, 774 S.W.2d at 234. We overrule appellant's first issue.

## II.    Jury Instruction

In his second issue, appellant complains the jury charge failed to instruct the jury "about the meaning of 'in the course of committing or attempting to commit the offense of robbery.'" Again, relying on his erroneous interpretation of *Ibanez*, appellant argues the jury charge failed to describe the State's burden to prove that the underlying murder occurred in order to "facilitate the taking of the property." Texas Code of Criminal Procedure Article 36.14 directs the trial judge to "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PRO. art. 36.14; *Mendez v. State*, 545 S.W.3d 548, 551–52 (Tex. Crim. App. 2018). Because we have already rejected appellant's reading of *Ibanez*, we conclude the "facilitate" language in that case was not "law applicable to the case," and the trial did not err in excluding such language from the jury charge.[3] *See*

---

[3] We note without further discussion that the charge conference, if any, is not part of the record. Appellant does not purport to argue that the absent language is statutorily required. Based upon our

–11–

TEX. CODE CRIM. PROC. art. 36.14; *Mendez v. State*, 545 S.W.3d at 551–52; *Ibanez,* 749 S.W.2d at 807. We overrule appellant's second issue.

### III. Jury Polling

In his third issue, appellant complains that the trial court erred in failing to conduct the polling of the jury pursuant to article 37.05 of the code of criminal procedure. Article 37.05 provides the State and the defendant each have the right to have the jury polled, which is done by calling separately the name or identification number of each juror and asking the juror if the verdict is the juror's. TEX. CODE CRIM. PROC. art. 37.05. The purpose of the jury poll is to ensure the unanimity of the jury verdict by establishing that each juror agrees with the verdict as announced. *See Ex parte Aviles*, 78 S.W.3d 677, 683 (Tex. App.—Austin 2002, no pet.). The right to a jury poll is forfeited by the failure to request it before the verdict is accepted. *Cook v. State*, 390 S.W.3d 363, 373 n.30 (Tex. Crim. App. 2013) (citing *Mathis v. State*, 471 S.W.2d 396, 398 (Tex. Crim. App. 1971)).

Here, with the jury present in the courtroom, the trial judge read aloud the jury's guilty verdict and then asked defense counsel if he wanted to have the jury polled. Counsel said he did. The trial judge stated, "If, in fact, this is your verdict, would you signify the same by raising your hand? There are 12 hands raised. Thank you." The trial judge then thanked the jurors for their service and dismissed the jury.

---

interpretation of *Ibanez*, appellant's asserted instruction is not the law applicable to the case, thus, there is no harm, egregious or otherwise.

Appellant did not object to the trial judge's manner of polling the jury. Accordingly, we conclude appellant forfeited his right to have the jury polled in strict conformity with article 37.05. We overrule appellant's third issue.

## IV. Judgment Reformation

In his fourth issue, appellant complains the judgment erroneously states that he is not subject to release from confinement under applicable parole law and asks that the judgment be reformed. Specifically, appellant argues that, because he was seventeen years old at the time of the murder, he is eligible for parole. The State agrees that the judgment is erroneous in this respect and should be reformed.

This court has the power to correct and reform the judgment of the court below to make the record speak the truth when it has the necessary data and information to do so, or make any appropriate order as the law and the nature of the case may require. *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd). Section 12.31(a) of the penal code provides in pertinent part:

> An individual adjudged guilty of a capital felony in a case in which the state does not seek the death penalty shall be punished by imprisonment in the Texas Department of Criminal Justice for:
>
> (1) life, if the individual committed the offense when younger than 18 years of age; or
>
> (2) life without parole, if the individual committed the offense when 18 years of age or older.

TEX. PENAL CODE ANN. § 12.31(a); *Lewis v. State*, 428 S.W.3d 860, 863 (Tex. Crim. App. 2014). The record shows appellant was seventeen years old at the time of the

murder.  Accordingly, we sustain appellant's fourth issue.  We reform the trial court's judgment to delete the words "without parole" from appellant's sentence.

## V.    Cumulation a/k/a Stacking Sentences

In his fifth issue, appellant argues the trial court lacked discretion to cumulate his sentence in this case with the sentence from a prior conviction because the State presented no proof of that prior conviction.

Under article 42.08 of the code of criminal procedure, when the same defendant has been convicted in two or more cases, a trial judge has discretion to cumulate the defendant's sentence for the second conviction.  TEX. CODE CRIM. PROC. ANN. art. 42.08(a).  However, only when the record contains some evidence that links the defendant to the prior convictions is the trial judge's authority under 42.08(a) triggered.  *Miller v. State*, 33 S.W.3d 257, 261 (Tex. Crim. App. 2000).  In other words, the record must support the trial judge's exercise of discretion.  *Id.*  In *Miller*, the court held that defense counsel's admission that appellant was "serving 30 years right now" constituted sufficient evidence linking appellant to two prior convictions.  *Id.* at 262.

In February 2020, the State filed a motion to cumulate appellant's sentence in this case on the time served in the "other case(s)" he had pending.  At a pretrial hearing on May 26, 2021, the trial court raised the issue of the State's motion to accumulate sentences.  The prosecutor stated that appellant had "already been found guilty of a capital murder and is currently serving life with parole, so we are going

–14–

to ask the judge to stack whatever sentence on top of this existing" sentence. Defense counsel did not object or dispute the existence of appellant's prior capital murder conviction or the fact that he was already serving a life sentence for that offense. Defense counsel, in referring to "conversations with the State concerning if any plea bargain offer was on the table," stated "we had talked about 35 years or 40 years because that's the length of time he has on his sentence now before he's eligible for parole." We conclude this constituted "some evidence" linking appellant to his prior capital murder conviction, thus triggering the trial judge's authority under 42.08(a). *See id.* at 261–62. Under these circumstances, the trial court did not abuse its discretion in cumulating appellant's sentence in this case with the sentence from his prior conviction. *See* TEX. CODE CRIM. PROC. ANN. art. 42.08(a); *Miller*, 33 S.W.3d at 261–62. We overrule appellant's fifth issue.

## VI.    Cross-Issue: Judgment Reformation

In a single cross-issue, the State requests that the judgment be reformed to include a deadly weapon finding and to reflect that appellant's punishment was assessed by the trial court. The jury charge instructed the jury to find appellant guilty of capital murder as charged in the indictment if the jury found appellant caused Ontiveros' death by "causing blunt force injuries to the deceased with a rod or a pipe or a pole or an unknown object, a deadly weapon." The record also shows that appellant's punishment was assessed by the trial court. Accordingly, we sustain the State's cross-issue and modify the judgment in this case to include a deadly weapon

–15–

finding and to reflect that appellant's punishment was assessed by the trial court.

*See Asberry*, 813 S.W.2d at 529.

As reformed, we affirm the trial court's judgment.

/Bonnie Lee Goldstein/.

BONNIE LEE GOLDSTEIN
JUSTICE

210563f.u05
Do Not Publish
TEX. R. APP. P. 47.2(b)



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ANGEL LISANDRO SANCHES-
ZENTENO, Appellant

No. 05-21-00563-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the 204th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. F-1770139-Q.
Opinion delivered by Justice
Goldstein. Justices Reichek and
Kennedy participating.

Based on the Court's opinion of this date, the judgment of the trial court is
**MODIFIED** as follows:
Under the heading "Punishment and Place of Confinement," "LIFE
WITHOUT PAROLE" is deleted, and "LIFE WITH THE
POSSIBILITY OF PAROLE" is substituted.
Under the heading "Finding on Deadly Weapon," "N/A" is deleted,
and "YES, A PIPE, ROD, POLE, OR UNKNOWN OBJECT" is
substituted.
Under the heading "Punishment Assessed by," "JURY" is deleted and
"COURT" is substituted.
As **REFORMED**, the judgment is **AFFIRMED**.


Judgment entered this 31st day of May, 2023.