**Affirmed and Opinion Filed December 2, 2024**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-22-00701-CR**

**CARLOS RAUL LARIOSTREJO, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 203rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1922702-P**

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Reichek, and Carlyle
Opinion by Justice Partida-Kipness

Appellant Carlos Raul Lariostrejo appeals his conviction for murder and forty-year sentence for beating sixty-six year old Kristina Dahl to death with a hammer. Lariostrejo challenges the legal sufficiency of the evidence to support the conviction, complains of charge error and evidentiary rulings, and contends he was denied a speedy trial. We affirm.

## BACKGROUND

Kristina Dahl was a neurologist who grew up in Southwestern Wisconsin. During her adult life, Dahl began suffering from severe back pain and other health

issues. Dahl was also extremely sensitive to chemical products and odors. She was prescribed oxycodone oral tablets and Fentanyl dermal patches to treat her chronic back pain. Dahl moved to the Dallas area in 2016 to work with and get treatment from a physician specializing in environmental medicine. In October 2019, Dahl rented a room in a house located at 13716 Stardust Lane, Farmers Branch, Texas. Lariostrejo's parents owned the house, and he was living there for free to complete repairs and renovations. When Dahl moved in, Joshua Munguia was already renting one of the other bedrooms in the house. Munguia worked in San Antonio and was often gone for multiple days at a time. When Munguia was in town, he usually stayed across the street at the home of his girlfriend, Julie Reddy.

On December 14, 2019, Dahl was found dead in her bedroom by Officer Jason Henrichs of the Farmers Branch Police Department (FBPD) during a welfare check requested by Dahl's sister, Katherine Dahl. The frame of her bedroom door facing the hallway was sealed with tape and the door was locked from the inside. Dahl had suffered "massive blunt force trauma to the back of her head" and a hammer was located with her body. Lariostrejo was indicted for Dahl's murder and convicted following a five-day jury trial. Because Lariostrejo challenges the sufficiency of the evidence to support the conviction, we will set forth the facts in detail.

## I.     Events Prior to the December 14, 2019 Welfare Check

After moving into Lariostrejo's home, Dahl mentioned to her sister, Katherine Dahl, that she thought someone was stealing her prescription medications and using

her credit cards. Dahl also told Munguia that some of her medications had been stolen from her room at the house, $1,500 had been taken from her bank account in two ATM transactions, and she did not remember making those withdrawals. On November 13, 2019, FBPD Officer Ceicil Greer responded to a call at Lariostrejo's house. As he was leaving, he spoke briefly to Dahl. She told Officer Greer that she believed Lariostrejo had stolen $1,500 from her and stolen her medication.

Multiple witnesses provided information, which pieced together a timeline of relevant events that occurred between Officer Greer's November 13, 2019 call and Officer Henrichs discovery of Dahl's body on December 14, 2019. For example, Munguia and Reddy confirmed they spent Thanksgiving[1] with her family in Dallas, and Munguia was in San Antonio for work from December 3, 2019, to December 12, 2019. Esther Sanchez, a neighbor who had become friends with Dahl, confirmed she last saw Dahl alive on December 5, 2019.

On December 7, 2019, Bianca Blanco Rios, one of Lariostrejo's friends from church, went to Lariostrejo's house after a Christmas Party. Lariostrejo asked Rios if the house smelled weird. She thought the house smelled like a dog after it has been outside. Lariostrejo asked Rios to take him to Walmart to buy something to make the house smell nice. He bought Febreze at Walmart and, when they returned to his house, Lariostrejo sprayed the Febreze in the house and all around the door to Dahl's

---

[1] Thanksgiving fell on Thursday, November 28, 2019.

–3–

room. Lariostrejo told Rios that Dahl's room "always smelled bad," which is why he thought the house smelled weird.

On Sunday morning, December 8, 2019, Lariostrejo sent the following text message to Munguia:

> I don't think Christina is home, but she has clogged the toilet and it's starting to smell. I'm at church. When I get home, I'll air out the house and clean the restroom. By the way, when are you coming back?

At 12:06 p.m., Munguia responded, "Lovely. I won't be back until sometime Thursday [the 12th]." Munguia testified that Lariostrejo did not usually ask him when he would be home following work trips.

On December 9, 2019, a new phone number was added to Dahl's iPhone XR. The same day, Lariostrejo sold an iPhone XR to J.F.[2], another friend from church. J.F. told police the phone was already active when Lariostrejo gave it to him, and Lariostrejo told J.F. he would pay the bill. The investigation confirmed the iPhone XR sold to J.F. was actually Dahl's cell phone, and the new number added to her phone was J.F.'s cell phone number on that phone.

Sometime in December 2019, J.F. helped Lariostrejo paint the living room and kitchen in the house. When J.F. went to the house to paint, he noticed the house smelled really bad, "it stinked - - it smelled - - I just barely walked in the house, and

---

[2] J.F. was seventeen years old in December 2019. To protect the identity of a minor, we refer to the minor with initials or a pseudonym. *See* TEX. R. APP. P. 9.8(b)(2). J.F. met Lariostrejo a few months before Munguia and Dahl moved into the house. J.F. testified he hung out at Lariostrejo's house at least twice a week.

I smelled it." Lariostrejo told J.F. the smell was from spoiled food in Dahl's room. He said Dahl was out of town and had left food in her room that had gone bad and was stinking up the house. Lariostrejo also told J.F. he was going to tape up the door to her room to keep the smell out of the house and to keep the paint fumes out of her room since Dahl was sensitive to smells. J.F. admitted at trial that he saw silver tape around the door to Dahl's room after that.

On December 10, 2019, a neighbor's security camera captured video of Lariostrejo peering from the yard into Dahl's bedroom window with a flashlight late in the evening. Lariostrejo's step-father, Jose Villegas, is with Lariostrejo in the video. At trial, Villegas testified for the defense. On cross-examination by the State, he testified he did not know if he went inside the house on December 10 and did not remember what Lariostrejo said to him when they were outside the window.

On December 12, 2019, Lariostrejo went to Best Buy and picked up an order made on Dahl's account and listed in her name. The order included an iPad Pro, a keyboard case for the iPad Pro, and an iPad pencil. The items were ordered under Dahl's name on December 12, 2019. Best Buy records also showed Lariostrejo purchased a screen protector and a hard shell case for an iPad Pro on December 9, 2019.

Munguia returned from San Antonio on December 12, 2019. Reddy recalled going to Lariostrejo's house with Munguia that day. She told detectives the house looked and smelled "very, very clean. It smelled – smelled like cleaning products.

And there was no dirt on the floor, no dishes in the sink, which was just unusual from my experience having been over there." Reddy also testified the house "was really cold" that day. She said the temperature had been turned down so low it felt like you needed to wear a thick sweater to stay warm. Reddy told defense counsel on cross-examination that the few times she had been to Lariostrejo's house before December, "the house was at a normal temperature for what people keep houses, 72, 75. And then it changed, and it was like, 60, degrees in there." She also confirmed the house was cold on December 12 because the air conditioning was on, not because it was cold outside.

Reddy and Munguia testified that Dahl's bedroom door was taped up when they were at the house on December 12, 2019. According to Munguia, the silver tape was all around the door frame:

> So, like, you have hinges on one side, and you have a handle on the other. The tape was along the top, down the handle side and down the bottom to, like, seal up any air gaps where the -- where the door and the rest of the frame meet.

Lariostrejo told Munguia that Dahl was out of town, and he taped the door because he planned to do some painting and wanted to keep the paint fumes out of Dahl's bedroom. Reddy knew Dahl had medical issues, so taping the door to keep fumes out "made sense" to Reddy at the time. Munguia thought Lariostrejo was being thoughtful considering Dahl's allergies and medical issues.

On December 13, 2019, Rios went to Lariostrejo's house. She saw he had placed duct tape all around the door to Dahl's bedroom. Lariostrejo told Rios he was

"keeping the old people smell away" and would remove the tape when Dahl returned from being out-of-town. They then hung out in the garage. According to Rios, they usually hung out in Lariostrejo's room or the living room. December 13, 2019 was the first time they hung out in the garage. By this time, Rios recalled Lariostrejo had a new iPhone, a new Apple Watch, and had opened a new bank account at Wells Fargo.

Dahl's sister, Katherine, testified she texted Dahl on Thanksgiving Day, but Dahl did not respond. Katherine did not find this particularly suspicious and assumed Dahl must have been busy. But when Dahl also failed to respond to several text messages and did not answer a phone call from Katherine after Thanksgiving, Katherine checked Dahl's Facebook page and saw she had not posted recently. On December 14, 2019, Katherine called 911 and requested the FBPD conduct a welfare check on Dahl.

## II.    December 14, 2019 Welfare Check

FBPD Officer Jason Henrichs conducted the requested welfare check. Munguia answered the door when Officer Henrichs arrived. He explained why he was there, and Munguia stated he and Dahl both rented rooms in the house. Munguia took Officer Henrichs to the room Dahl rented. Officer Henrichs observed the edges of the door to the room were taped with "some type of either duct tape or some real thick heavy-duty tape," which he thought was "odd." When asked, Munguia told

Officer Henrichs a third person[3] lived in the house, and that roommate's room was across the hall from Dahl's room. Officer Henrichs knocked on the third roommate's door and, when no one answered, he opened the door, looked inside, and saw no one was in the room. Because the door to Dahl's room was taped shut and locked, but Officer Henrichs still needed to check on her welfare, Munguia walked him outside to Dahl's bedroom window. Officer Henrichs testified he could not really see anything through the window, so he opened it. The smell of a dead body immediately came out of the window. He had not smelled any odors coming from the room before the window was opened or when they were inside the house.

Officer Henrichs could not fit through the window, so he asked Munguia to go through the window and unlock the door. Munguia did so, and Officer Henrichs was then able to enter the room through the door from inside the house. Officer Henrichs saw what appeared to be a body on the floor covered in blankets or a sleeping bag. He "peeled back a couple of layers of blankets" and saw a body. He testified that what he saw was "pretty gruesome." The woman was "green in color," there was a hammer laying by her head, and "the head was all smashed in with dry blood everywhere." What he saw startled him because the woman "was green, and the blood everywhere, a hammer. It was pretty - - pretty nasty." Officer Henrichs recalled that Munguia's reaction to seeing the body was "genuine" and he seemed

---

[3] It is undisputed that person was Lariostrejo.

"just as shocked" as Officer Henrichs. Dahl's room was locked from the inside, and, according to Officer Henrichs, the tape around the door "was around all the evidence. And there was no - - no opening that the smell could get in and out." Because it was clear a crime had occurred, Officer Henrichs secured the scene and called for detectives to come to the scene and investigate.

After seeing Dahl's body, Munguia ran to the front yard. Reddy testified Munguia had gone to Lariostrejo's house on December 14, 2019, to pack for a work trip to San Antonio. Reddy was on her couch in her living room when she saw the police officer knocking on Lariostrejo's door. She watched as Munguia answered the door, let the police officer in, and then came back out with the officer and walked with him to the back of the house. She saw Josh come out the front door a few minutes later:

> And he looked – he was gagging, and he looked, like, physically ill, which worried me because I knew he was about to start driving. So at that point, I walked over to see if he was okay because he looked very upset and was gagging.

Munguia was shaken up and told Reddy they found Dahl in her room and it was "[v]ery obvious that she had been there for a while, and the smell was atrocious." Officers separated Munguia and Reddy and transported them to the station for questioning. At trial, Officer Henrichs described Munguia as "calm and cooperative" during their entire interaction. Because of his demeanor, Officer Henrichs told the jury he believes Munguia was unaware Dahl was dead inside the room, and he did

–9–

not believe Munguia was involved in her murder. Munguia voluntarily answered the officers' questions and provided fingerprints and a DNA sample.

FBPD Detectives Gary Bone and Richard Willborn responded to the scene to assist with searching the house and collecting evidence. Dahl had "massive blunt force trauma to the back of the head" and a hammer was found with her body. Detective Willborn described the hammer found with Dahl's body as "a unique hammer" that is "used for auto mechanic's or body work." He learned during the investigation that Lariostrejo had prior experience working in a body shop. He also told the jury that a hammer is capable of causing serious bodily injury or death. Detective Willborn testified the blood remaining on the floor after the medical examiner removed Dahl's body was dry. He also noticed the tape that had been placed on the bottom of the door appeared to have been placed over decomposition.

Because there was no blood spatter in the room and a lack of "cast-off" from Dahl's head wound where her body was found, Detectives Bone and Willborn concluded Dahl was killed somewhere else and was then moved into the bedroom. According to Detective Willborn, if Dahl had been killed in the bedroom, there should have been "massive amounts of blood surrounding her, coming through the door, through the walls, et cetera." There was also what appeared to be a drag mark through the blood and decomposition. Detective Willborn testified he believes Dahl was dragged into the bedroom by the feet because of the position of her body in the room; her hands were extended up above her head, the body was right inside the

door, and her pants were pulled down to where her underwear were exposed, so it appeared she was pulled by her feet into the room.

The FBPD used BLUESTAR® Forensic blood reagent throughout the house to luminate the crime scene and search for latent blood. BLUESTAR® Forensic is a substance that luminesces blood after blood has been cleaned up. Here, the product showed blood on the kitchen floor, kitchen sink, and kitchen cabinets, in the living room, on the ceiling in the living room, in the hallway leading to the bedrooms, on the floor outside of Dahl's bedroom and outside of Lariostrejo's bedroom, and on Lariostrejo's bedroom door and floor. Detectives concluded from this evidence that Dahl was killed in the kitchen or living room and then dragged by her legs into her bedroom.

Officers used BLUESTAR® Forensic to perform a luminescence test in Dahl's vehicle. The presence of blood was found on the driver's seat, the floorboard of the driver's seat area, and on the indoor door panel of the driver's side.

Dr. Jeffrey Barnard conducted Dahl's autopsy. He observed three impact sites on her head and bruising on her left shin. The blunt force injuries to the head included lacerations of the head, skull fractures, and subdural hemorrhage. The autopsy revealed the bruise on her left shin was a recent injury. Dr. Barnard told the jury "the three lacerations show there are at least three different strikes." The laceration he designated as "Impact Site No. 1" was a large area. He concluded there was at least one strike at each of the three impact sites and there could have been more than one

strike at Impact Site No. 1. Dr. Barnard also testified Dahl was "in moderate to advanced decomposition." He stated the decomposition is "consistent with [being dead] several days" but he could not determine on what day she died or give "any sort of specific timing." Dr. Barnard concluded the manner of death was homicide, and the cause of death was blunt force injuries to the head. It is his opinion Dahl's injuries were caused by a deadly weapon, and a hammer is a deadly weapon.

### III. Physical Evidence Collected From the Crime Scene

Officers found a portable air conditioner set to fifty-seven degrees in the room with Dahl's body. They also found a bottle of Febreze in Dahl's bedroom. After speaking with Rios, J.F., Munguia, and Dahl's family and learning of Dahl's sensitivity to smells and chemicals, Detective Willborn concluded there was no way Dahl would have voluntarily had a bottle of Febreze in her bedroom. Detectives found a bottle of vinegar in the bathroom. According to Munguia, Dahl used vinegar to clean everything because it did not trigger her allergies. Detectives found other cleaning supplies throughout the house, including a mop, bucket, Clorox bottle, and rugs in the back yard, a Lysol can, and other cleaners in the hallway. Detective Willborn told the jury it was not normal for those cleaners to be in the house with Dahl because the investigation showed Dahl "couldn't handle chemical smells. She didn't like strong smells, things like that."

Detective Willborn testified officers also found a good amount of paint splatter in the house, including in the kitchen and on the floor of Lariostrejo's

–12–

bedroom. Detective Willborn described the paint on Lariostrejo's bedroom floor as "all over the place." He believes the amount and location of paint indicates the paint may have been used in a hurried manner to cover up blood spatter. Rios testified that between October and December 2019, she had visited Lariostrejo at the house about ten times and spent time in Lariostrejo's bedroom. She told the jury there was paint on his bedroom floor during that time, but the crime scene photos taken December 14, 2019, showed "a lot more paint on there" then she had seen previously.

Detectives found the following items in a trash can in Lariostrejo's bedroom: a piece of mail addressed to Dahl from Best Buy regarding her Best Buy Visa Card, a latex glove, and pieces of the same type of tape used to seal Dahl's bedroom door. They also found an iPhone 11 Pro Max phone, an Apple Watch, Fentanyl patches, the keys to Dahl's car, and a new iPad Pro with a keyboard case and stylus in Lariostrejo's bedroom. Further investigation confirmed the serial numbers of the iPad Pro, keyboard case, and stylus matched the items ordered on Dahl's account on December 12, 2019, and picked up at Best Buy by Lariostrejo the same day. No items belonging to or associated with Dahl were found in Munguia's room.

Dahl's bank records showed multiple checks written from Dahl's checking account between December 3, 2019, and December 9, 2019. On December 3, 2019, a check for $50 in rent was made out to Rose Trejo, who is Lariostrejo's mother. Detective Willborn concluded that check was written by Dahl because it is consistent with a text message Dahl sent to Lariostrejo on December 2, 2019, referencing that

she had discovered she had failed to pay $50 of her rent to Lariostrejo's mother at the beginning of the month. On December 6, 2019, a check was written in the amount of $500 to Lariostrejo for "car parts and paint," and a check in the amount of $66.95 was written to the City of Farmers Branch for a utility bill. On December 7, 2019, a check in the amount of $1,265 was written to Lariostrejo for "Auto part install/paint, Subaru Outback. " Two days later, another check was written to Lariostrejo in the amount of $989 for "final payment on car repair and alignment." Detective Willborn testified the vehicle was a 2003 Subaru that was "pretty run-down" and did not appear to have been painted or repaired. He found it "unlikely" someone would spend $2,700 on repairs for that car. Further, by December 9, 2019, J.F. was in possession of Dahl's cell phone. It did not make sense to Detective Willborn that Dahl was writing checks to Lariostrejo on the same day Lariostrejo sold Dahl's phone to J.F.

## IV.    Data Extraction and Cell Phone Records

The FBPD extracted data from Munguia's personal phone and work phone, the iPhone XR sold by Lariostrejo to J.F., the iPhone 11 Pro Max phone and Apple Watch found in Lariostrejo's bedroom, and an iPhone 8 collected from Lariostrejo's parents' home. Investigators also obtained cell phone records from the carriers related to each cell phone found.

### A. Munguia's cell phones

The data extraction and cell phone records of Munguia's personal cell phone and work cell phone corroborated Munguia and Reddy's statements that Munguia was in San Antonio from December 3, 2019, to December 12, 2019.

### B. The iPhone XR

Detectives did not recover Dahl's cell phone from the crime scene or her vehicle. They did, however, obtain cell phone records for her phone number from her cellular carrier, Verizon. Those records showed Dahl's phone was an iPhone XR with a phone number[4] beginning with 608, which is a Wisconsin area code. According to Verizon records, on December 8, 2019, Dahl's iPhone XR had an IMEI number ending in 2446. The records also showed a secondary phone number of (214) 629-8608 was added to Dahl's Verizon account and activated on December 9, 2019. J.F. identified that new phone number as his cell phone number for the iPhone XR he purchased from Lariostrejo on December 9, 2019. Investigators retained the iPhone XR in J.F.'s possession and extracted data from the phone. They found the iPhone XR obtained from J.F. had the same IMEI number as Dahl's iPhone XR. Detective Bone explained how the new phone number would have been added to Dahl's cell phone:

> So on December 9th, the -- Verizon was contacted somehow, and the secondary line was added. That would have been attached to a SIM card, and it was placed in that phone. So somebody added a secondary

---

[4] Dahl's cell phone number was (608) 606-1661.

line on top of the original phone number, and both are linked now to the same phone.

J.F. testified he did not know the iPhone XR he bought from Lariostrejo was Dahl's cell phone until the prosecutor told him during the State's examination of him at trial.

### C.    The iPhone 11 Pro Max

Subscriber information retrieved from the iPhone 11 Pro Max found in Lariostrejo's bedroom listed Dahl as the subscriber. Detective Willborn testified this led him to conclude Lariostrejo ordered the iPhone 11 using Dahl's account. Further, records from Dahl's Verizon account showed her (608) phone number was attached to a new IMEI, a new phone, on December 12, 2019. The new phone using her number was an iPhone Pro Max, which is the same phone model found in Lariostrejo's bedroom.

### D.    The iPhone 8 collected from the home of Lariostrejo's parents

Detectives recovered an iPhone 8 from the home of Lariostrejo's parents. That phone had the phone number (214) 642-0513. Detectives concluded the iPhone 8 was Lariostrejo's phone because the email listed in the phone's "User Accounts" was CarlosLarios@my.unt.edu, the information in the "Source's Health" account matched Lariostrejo's date of birth, height, and weight, and Rios confirmed number (214) 642-0513 was Lariostrejo's phone number. The phone extraction records revealed the following apps were added to that phone on December 7, 2019: Wells

Fargo, Best Buy, and Verizon Smart Family. It was odd to Detective Bones that Verizon Smart Family was added to that phone because Lariostrejo's cell phone carrier was not Verizon; but Dahl's carrier was Verizon. The phone extraction also showed two iPads and an Apple Watch had been connected to the iPhone 8 via Bluetooth. Records also showed the phone number assigned to the iPhone 8 was the same cell phone number from which texts were sent to J.F. on December 9, 2019, to the iPhone XR. Finally, records showed several calls were made to People's State Bank in Wisconsin, which was Dahl's bank, on December 6, 2019, between 2:00 a.m. and 3:00 a.m. Calls were made to the bank from Dahl's phone number at 2:35 a.m., and from Lariostrejo's iPhone 8 at 2:45 am, 2:46 a.m., and 2:47 a.m. Detective Willborn testified the calls to the bank from both phones were made "in the same area."

### E. The Apple Watch

Detectives also examined and extracted data from an Apple Watch found in Lariostrejo's bedroom. The identifying information in the Apple Watch showed it was named "Carlos's Apple Watch." The Apple Watch also received a message from Best Buy about the status of the order that was in Dahl's name. The message references an order number that matched the order number for the items that were ordered in Dahl's name, and which Lariostrejo picked up at Best Buy on December 12, 2019. Detective Willborn testified he believes the message appears on Lariostrejo's Apple Watch because Lariostrejo connected to Dahl's cell phone to

–17–

receive notifications from her Best Buy account. Detective Willborn also told the jury the Best Buy message showed Lariostrejo was "receiving information as if he is Christine [Dahl]."

Detectives also found the following text on the Apple Watch dated Wednesday, December 11, 2019, which appeared to be from Dahl to Lariostrejo:

> "Hello Carlos can you please sealed you're my room with tape of you do plan on painting the house like you mentioned
>
> It will help keep any of the toxins from entering the room
>
> Then place a fan near the door and air out the house
>
> I'll pay you 45 if you do this please and thank you for always being patient with me
>
> I'll be back right after Christmas I believe on the 26th"

Detective Willborn testified the analysis of the Apple Watch showed the message was actually sent from Lariostrejo's watch and was intended to look like it was coming from Dahl:

> Q. And so this message is -- and explain how – an Apple watch in Carlos's name and it appears to be an iCloud account of Ms. Dahl, explain to me what's going to on here.
>
> A. So basically when going through the watch, this was on Carlos's iWatch, and this is in a sent message. And so what that means and on the other message you'll see is what appears to be a mistake when he meant to say "your room." And I think he used two different words, "your" "me" because there was some confusion.
>
> But this is on the sent -- on Carlos's watch, this is a sent message showing as if it's coming from Christina, as if Christina were to send this message, but it's come from Carlos's watch to his sent messages.

Detective Willborn also concluded the language used in the text message was not consistent with how Dahl would speak based on her educational background.

### F. Social media accounts and prescription records

Investigators also looked at Lariostrejo's social media accounts. For example, Lariostrejo's Snapchat account showed messages posted on November 23, 27, 28, and 29, 2019, referencing that Lariostrejo had morphine pills and Fentanyl patches. Detective Bone testified those messages indicated Lariostrejo was engaging in narcotics trafficking. Prescription records obtained by the FBPD confirmed Dahl had prescriptions for morphine pills and Fentanyl patches, but Lariostrejo did not.

### G. DNA test results

Detectives sent various items[5] to SWIFS for DNA testing. Ariel Welch, a forensic biologist at SWIFS, received the items first. Welch is primarily responsible for serology, which "is screening items of evidence for the presence of biological materials, such as blood, saliva, seminal fluid or skin cells." In this case, she looked for blood in the samples given to her by conducting a presumptive and confirmatory test on each item or sample:

> So for the presence of blood, we use two different types of test. We have a presumptive test, which is a color change test. So if I see a blue-green color change, that indicates to me that blood is present. If I don't see a color change, that indicates that blood is not present.

---

[5] The items included (1) Dahl's jeans, (2) the hammer found with Dahl's body, (3) the latex glove found in Lariostrejo's bedroom trash can, (4) a piece of silver tape found in Lariostrejo's bedroom, (5) a wad of tape collected at the crime scene, (6) the mop found in Lariostrejo's backyard, (7) samples swabbed from Lariostrejo's door frame, an iPhone, a key chain, and a Clorox bleach spray bottle, and (8) a buccal swab standard from Munguia.

Then we have a confirmatory test, and that test is run on a small plastic card similar to a pregnancy test. So if I see two lines, it's positive; if I see one line, it's negative.

Those tests confirmed the presence of human blood on the hammer head and showed blood might be present on the mop bristle, the swab from Lariostrejo's bedroom door frame, the glove, the piece of tape, and the wad of tape. Those items were sent to Courtney Ferreira, a forensic biologist and DNA Analyst at SWIFS, for DNA testing.

Welch also obtained samples from certain items that were then sent to Ferreira to conduct DNA testing. For example, the FBPD requested "a handler or touch sample" from Dahl's jeans because they thought she had been dragged by her ankles. According to Welch, there is no screening process to confirm if there are skin cells present on an item. Instead, she swabs the item where it is believed someone may have touched the item. Here, she swabbed the ankle area of the pant legs of Dahl's jeans and sent the swab for further testing. She also swabbed the glove, the piece of tape, and the handle of the hammer for further DNA testing.

Ferreira performed DNA analysis on the following items: (1) a swab from the ankle area of Dahl's jeans, (2) stains from the hammer found with Dahl's body, (3) three stains from the latex glove found in Lariostrejo's bedroom trash can, (4) a stain from the adhesive side and a sample from the non-adhesive side of a piece of silver tape found in Lariostrejo's bedroom, (5) three stains from a wad of tape collected at the crime scene, (6) the mop bristle of the mop found in Lariostrejo's backyard, and

(7) samples swabbed from Lariostrejo's door frame, an iPhone, a key chain, and a Clorox bleach spray bottle.

No DNA profile was obtained from the mop bristle or samples swabbed from Lariostrejo's door frame, an iPhone, a key chain, or the Clorox bleach spray bottle. Ferreira obtained DNA profiles from the other items tested. Lariostrejo's DNA profile was included in the swab from Dahl's jeans, the three stains on the glove found in his trash can, and both samples from the piece of tape found in his trash can. Ferreira testified the statistical weight for his inclusion in each of those samples was less than 1 in 10 trillion, which means:

> And to put that a little easier, there's roughly about 6.9 billion people on this earth. You would expect to - - in the population of a thousand earths, and you would expect to find that DNA profile one time.

Dahl's DNA profile was also found on the swab from her jeans, the stains from the head of the hammer, and the second and third stains tested from the wad of tape. The first stain from the wad of tape included Lariostrejo, Dahl, and Munguia. But Ferreira testified the sample "was possibly incomplete" and the DNA mixture statistically could include the DNA from "most people":

> It was a mixture of three individuals, and Kristina Dahl, Carlos Trejo and Joshua Munguia were all included as being potential contributors to that mixture. The statistical weight for that mixture was 100 in 100. So it was such that most all people would all be included as being potential contributors in the same weight to that mixture.

Munguia's DNA profile was excluded from all other samples.

## V.  Trial

Lariostrejo turned himself in to the Dallas County Sheriff's Office on December 15, 2019, and was taken into custody. Lariostrejo was indicted for murder on February 13, 2020. He made a speedy trial demand in July 2021, and filed a Motion to Dismiss for Speedy Trial Violation on August 9, 2021. The trial court heard the motion on August 10, 2021, and denied the motion to dismiss. As for the alleged speedy trial violation, the trial court set the case for trial on October 25, 2021. The trial judge also admonished the parties that there was a backlog of cases due to COVID-19 and older cases would take precedence over this case.

On October 18, 2021, the trial court rescheduled the trial to March 2, 2022. A docket sheet entry shows the court would be in trial on another case on October 25, 2021, and was resetting Lariostrejo's case to the next available trial date. On February 10, 2022, Lariostrejo agreed to reset his trial to June 20, 2022. On March 18, 2022, the trial court moved the trial date to June 13, 2022 as a special setting. The case was tried to a jury from June 13, 2022, through June 17, 2022. The jury found Lariostrejo guilty of murder as charged in the indictment and sentenced him to forty years' incarceration. This appeal followed.

## ANALYSIS

Lariostrejo brings six issues on appeal. We will address each issue in turn.

## I. Legal Sufficiency of the Evidence

In his first issue, Lariostrejo contends the evidence was legally insufficient to support the conviction because the State's evidence failed to prove he was the perpetrator beyond a reasonable doubt. He asks the Court to sustain this issue, reverse the judgment, and render a judgment of acquittal.

In assessing the sufficiency of the evidence to support a criminal conviction, we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational factfinder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Alfaro-Jimenez v. State*, 577 S.W.3d 240, 243, 243–44 (Tex. Crim. App. 2019). This standard requires that we defer "to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018). Circumstantial evidence is as probative as direct evidence and is sufficient, standing alone, to establish a defendant's guilt. *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Proof of mental state will almost always depend upon circumstantial evidence. *Duntsch v. State*, 568 S.W.3d 193, 216 (Tex. App.—Dallas 2018, pet. ref'd).

We will uphold the verdict unless a rational factfinder must have had reasonable doubt with respect to any essential element of the offense. *Jackson*, 443

U.S. at 319; *Brooks*, 323 S.W.3d at 895. In proving each element of the charged offense beyond a reasonable doubt, the State is not required to exclude every conceivable alternative to a defendant's guilt. *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). "Focusing on other reasonable explanations for evidence improperly applies the abrogated reasonable-alternative-hypothesis construct." *Ingerson v. State*, 559 S.W.3d 501, 509 (Tex. Crim. App. 2018). The jury has the exclusive role to resolve inconsistencies in the evidence, "including deciding whether the State's theory of the case is more credible than another reasonable, exculpating hypothesis raised by the evidence." *Ramsey v. State*, 473 S.W.3d 805, 808 n.3 (Tex. Crim. App. 2015). We consider only whether the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict. *Hooper*, 214 S.W.3d at 13. Reversal on evidentiary sufficiency grounds is restricted to "the rare occurrence when a factfinder does not act rationally." *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009); *see Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014) (stating that a reviewing court should not act as a "thirteenth juror"). In other words, the appellate scales are weighted in favor of upholding a trial court's judgment of conviction. *Winfrey v. State*, 323 S.W.3d 875, 879 (Tex. Crim. App. 2010). Here, the State had to prove Lariostrejo either:

> (1) intentionally or knowingly caused the death of Dahl by hitting Dahl with a hammer, a deadly weapon, or by inflicting blunt force trauma to

Dahl with an unknown object, a deadly weapon, the exact nature and description of which is unknown and unknowable to the grand jury; or

(2) intended to cause serious bodily injury to Dahl and committed an act clearly dangerous to human life, to-wit: by hitting Dahl with a hammer, a deadly weapon, or by inflicting blunt force trauma to Dahl with an unknown object, a deadly weapon, the exact nature and description of which is unknown and unknowable to the grand jury, thereby causing Dahl's death.

TEX. PENAL CODE § 19.02(b)(1)–(2). "Motive is not an element of murder, but it is a circumstance indicative of guilt." *Ingerson v. State*, 559 S.W.3d 501, 510 (Tex. Crim. App. 2018) (citing *Merritt v. State*, 368 S.W.3d 516, 526 (Tex. Crim. App. 2012) (opportunity and motive are circumstances of guilt)).

The cause and manner of Dahl's death — blunt force trauma to her head by a deadly weapon — were undisputed. The only issue at trial was the identity of the perpetrator. Lariostrejo argues the State's evidence had too many gaps to support conviction. He maintains there was no evidence to tie him to the murder weapon, the cleaning of the apartment, or Dahl's murder. He further contends the jury could not have identified him as the perpetrator beyond a reasonable doubt. Lariostrejo's argument is essentially that the State presented no direct evidence of guilt. "Identity may be proven by direct evidence, circumstantial evidence, or by reasonable inferences from the evidence." *Ingerson*, 559 S.W.3d at 509 (citing *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009)). Although no one saw Lariostrejo bludgeon Dahl with the hammer and drag her to the bedroom, the State presented strong circumstantial evidence that Lariostrejo was the perpetrator. After reviewing

the record, we conclude there is sufficient evidence to sustain Lariostrejo's conviction when the evidence is viewed in the light most favorable to the verdict.

The State presented evidence of Lariostrejo's motive and opportunity to commit the charged offense. While motive and opportunity are not elements of the offense and not sufficient to prove identity, they are "circumstances indicative of guilt." *Merritt*, 368 S.W.3d at 526; *see also Ingerson*, 559 S.W.3d at 510. Here, the evidence showed Lariostrejo was in the house during the time in which Dahl was murdered, took steps to conceal the murder, and financially benefited from her death.

Officer Heinrichs found Dahl's body on December 14, 2019. Her cause and manner of death were undisputed, and the medical examiner testified that, based on the level of decomposition, she had been dead "several days" before her body was found. The medical examiner also explained temperature can speed up or slow down decomposition. Dahl was last seen alive on December 5, 2019. In the days that followed, a portable air conditioner set to fifty-seven degrees was placed in Dahl's room, and by December 12, 2019, Lariostrejo had the air conditioner running in the house to the point Reddy felt like she needed to wear a sweater to stay warm.

Witness testimony and security camera footage confirmed Lariostrejo was at the house on December 7, 8, 9, 10, 12, and 13, 2019, and the evidence showed Lariostrejo was the only person living in the house between December 5, 2019, and December 14, 2019. During that time, Lariostrejo had access to Dahl's vehicle and bedroom, placed the silver tape around Dahl's bedroom door, gave different reasons

to Rios, J.F., Munguia, and Reddy for why the house smelled and why he placed silver tape around Dahl's bedroom door, painted the kitchen and living room, and cleaned the entire house with different cleaning agents. According to Rios, Lariostrejo bought Febreze on December 7, 2019, and then sprayed it around Dahl's bedroom door because her room "always smelled bad" and he thought that was why the house smelled "weird." A Febreze bottle was found in Dahl's bedroom when her body was discovered. Lariostrejo was also the only person with access to Dahl's bedroom during that time period with the ability and opportunity to put the Febreze bottle and portable air conditioner inside the room.

On December 8, 2019, Lariostrejo texted Munguia and told him Dahl clogged the toilet and it was starting to smell, so he would air out the house and clean the restroom. He also asked Munguia when he would be back from San Antonio. Lariostrejo gave J.F. a different explanation for the house's foul odor. J.F. testified that when he went to the house to help Lariostrejo paint, the house smelled really bad: "it stinked - - it smelled - - I just barely walked in the house, and I smelled it." Lariostrejo told J.F. the smell was from spoiled food in Dahl's room. He said Dahl was out of town and had left food in her room that had gone bad and was stinking up the house. Lariostrejo also told J.F. he was going to tape up the door to her room to keep the smell out of the house and to keep their paint fumes out of her room since Dahl was sensitive to smells. J.F. admitted at trial that he saw tape around the door to Dahl's room after that day.

It is undisputed that by December 12, 2019, the tape was around Dahl's bedroom door, and the house had been cleaned and smelled of cleaning products. According to Reddy, when she was at the house on December 12, 2019, the house looked and smelled "very, very clean. It smelled – smelled like cleaning products. And there was no dirt on the floor, no dishes in the sink, which was just unusual from my experience having been over there." She and Munguia testified the tape was around Dahl's door on December 12, and Lariostrejo told Munguia he taped the door to keep paint fumes out of the bedroom. On December 13, 2019, Lariostrejo told Rios the tape was to keep "the old people smell" out of the house. A rational fact-finder could conclude from this body of evidence that Lariostrejo murdered Dahl and took steps to conceal her body. *See Ex parte Weinstein*, 421 S.W.3d 656, 668 (Tex. Crim. App. 2014) (noting that defendant's attempt to conceal complainant's body in the trunk of his car in his garage was "strong evidence" of his "consciousness of guilt" as were his use of deodorizers, pesticides, and baking soda to conceal the odor and "made up stories about his roommate leaving rotting meat in the house" when asked about the smell); *see also Gear v. State*, 340 S.W.3d 743, 747 (Tex. Crim. App. 2011) (explaining that a jury may consider a defendant's inconsistent statements as affirmative evidence of guilt); *Guevara*, 152 S.W.3d at 50 (attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations are probative of wrongful conduct and are also circumstances of guilt).

The State also presented evidence Lariostrejo had items belonging to Dahl in his possession when her body was discovered. Those items included Dahl's car keys, mail related to her Best Buy credit card, and the iPad Pro, keyboard case, and stylus ordered on Dahl's Best Buy account on December 12, 2019, and picked up by Lariostrejo at Best Buy the same day. The evidence was undisputed Lariostrejo sold Dahl's iPhone XR to J.F. on December 9, 2019, transferred Dahl's cell phone number to his new iPhone 11 Pro Max cell phone on December 12, 2019, and had access to her Best Buy account, checkbook, and cell phone messaging account. A rational fact-finder could conclude from this evidence that Lariostrejo wrongfully took possession of those items and accessed Dahl's accounts at or near the time of the murder, supporting an inference of Lariostrejo's guilt. *See Vela v. State*, No. 14-17-00315-CR, 2019 WL 758338, at *7 (Tex. App.—Houston [14th Dist.] Feb. 21, 2019, pet. ref'd) (mem. op., not designated for publication) (citing *Dawkins v. State*, 495 S.W.3d 890, 896 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (holding sufficient evidence existed to support murder conviction based on, among other things, defendant's possession of car, television, and DVD player from complainant's apartment)).

As for motive, the evidence showed Dahl told law enforcement and Munguia that she suspected Lariostrejo had stolen $1,500 from her and her prescription medications. Detectives found Fentanyl patches in Lariostrejo's room and Snapchat messages on Lariostrejo's account saying he had oxycontin and Fentanyl patches.

Detective Wilborn testified this evidence indicated Lariostrejo was stealing the Fentanyl patches from Dahl and selling them for profit. Detective Bone told the jury the Snapchat messages indicate Lariostrejo was involved in narcotics trafficking. "Motive to kill based on anger or a desire to obtain drugs are circumstances indicative of guilt." *Vela*, 2019 WL 758338, at *7 (first citing *Ingerson*, 559 S.W.3d at 510 (anger is a motive for murder indicating guilt); and then citing *Gibbs v. State*, 555 S.W.3d 718, 731 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (evidence of defendant's prior drug transactions and knowledge of where drugs were kept in apartment was relevant to motive and made defendant's identity as shooter more probable))).

Further, the evidence shows Lariostrejo benefitted monetarily. In addition to the iPad Pro and accessories purchased on Dahl's Best Buy account, detectives found checks written to Lariostrejo from Dahl's bank account on December 6, 7, and 9, 2019, totaling $2,754. The memo information indicated the checks were to pay Lariostrejo for repairing and painting Dahl's 2003 Subaru. However, Dahl's vehicle had not been painted and had noticeable damage when the FBPD searched the vehicle. Detective Willborn testified he found it "unlikely" someone would spend that amount of money to repair and paint a vehicle in the condition and age of Dahl's Subaru. From this evidence, a jury could have believed Lariostrejo had a motive to kill Dahl because he did not want Dahl to report his theft and drug sales to police or he wanted money from Dahl. *See, e.g., Dawkins v. State*, 495 S.W.3d 890, 897–98

–30–

(Tex. App.—Houston [14th Dist.] 2016, no pet.) (a rational jury could have inferred from the evidence that the appellant killed his girlfriend for her money where he knew the victim had money in her bank account and "within hours of the murder, he bought a new cellphone and began a three-day spending spree"); *see also Vela*, 2019 WL 758338, at *7; *Gibbs*, 555 S.W.3d at 731.

The physical and forensic evidence also implicated Lariostrejo and supported the verdict. Lariostrejo's DNA profile was included in the swab from Dahl's jeans, the three stains on the glove found in his trash can, and both samples from the piece of tape found in his trash can. Ferreira testified the statistical weight for Lariostrejo's inclusion in each of those samples was less than 1 in 10 trillion. Munguia was ruled out as a suspect because he was working in San Antonio during the time frame Dahl was killed. Further, detectives found no items related to Dahl in Munguia's bedroom or possession, and Munguia's DNA was excluded from all but one sample tested. And that sample was likely incomplete and could not exclude anyone.

While each circumstance of guilt considered in isolation is insufficient to prove Lariostrejo murdered Dahl, when all of the evidence is viewed in the light most favorable to the verdict, and we consider the cumulative force of all the admitted evidence and reasonable inferences that can be drawn therefrom, we conclude the evidence was sufficient to support the verdict. *See Ingerson*, 559 S.W.3d at 511. The combined and cumulative force of all admitted evidence was sufficient to support the jury's finding that Lariostrejo was the person who murdered

–31–

Dahl. *See id.* at 509 (identity may be proven by direct evidence, circumstantial evidence, or by reasonable inferences from evidence); *see also Merritt*, 368 S.W.3d at 526 (explaining that when identity is at issue, court must consider combined and cumulative force of all evidence). We overrule Lariostrejo's first issue.

## II.     Jury Charge Error – Alternative Theories of Guilt

In his second issue, Lariostrejo asserts the trial court erred in its instructions to the jury by permitting the jury to convict him under two alternative theories for murder when the evidence supported only one. In reviewing a jury-charge issue, we first determine whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If we conclude error exists, we analyze the error for "some harm" to the defendant's rights when the defendant properly objected to the jury charge and for "egregious harm" when, as here, the defendant failed to object to the charge. *Id.* at 743–44 (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)). Harm is assessed "in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171. The harm must be actual, not just theoretical. *Id.* at 174.

The jury charge included instructions on two theories of guilt: (1) intentionally or knowingly causing the death of Dahl, or (2) intending to cause serious bodily injury to Dahl and committing an act clearly dangerous to human life that caused

–32–

Dahl's death. *See* TEX. PENAL CODE §§ 19.02(b)(1)–(2).[6] Lariostrejo argues the trial court erred in submitting the theory of intent to cause serious bodily injury because it was not supported by sufficient evidence. *See* TEX. PENAL CODE § 19.02(b)(2) (a person commits murder if the person "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual").[7] Specifically, Lariostrejo contends the trial court erred by submitting intent to cause serious bodily injury because it is "obvious that repeated blows to the head of another with the resulting brain damage shown in the autopsy and [crime] scene photographs could have been delivered only with the objective of causing Dahl's death. No accident or different intent is evident." TEX. PENAL CODE § 19.02(b)(1) (providing a person commits the offense of murder if the person intentionally or knowingly causes the death of an individual). The State maintains a reasonable juror could have found Lariostrejo guilty under the alternative theory. We agree with the State.

A trial court must deliver to the jury a written charge that distinctly sets forth the law applicable to the case. TEX. CODE CRIM. PROC. art. 36.14; *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007). This requires instructions that apply

---

[6] Each theory of guilt included the allegation that Lariostrejo used a deadly weapon in the commission of the offense; either by hitting Dahl with a hammer, a deadly weapon, or by inflicting blunt force trauma to Dahl with an unknown object, a deadly weapon, the exact nature and description of which is unknown and unknowable to the grand jury.

[7] Appellant did not move for a directed verdict on this theory, nor did he object to the jury charge, and the State did not waive the allegation in the indictment.

the law to the facts adduced at trial and conform to the allegations in the indictment. *Sanchez v. State*, 376 S.W.3d 767, 773 (Tex. Crim. App. 2012) (op. on reh'g). Alternative theories alleged in the indictment, such as the manner and means of committing an offense, should be included in the jury charge only if the evidence presented at trial supports those theories. *Id.* at 773–74.

The indictment in this case alleged Lariostrejo committed the offense of murder under two alternative theories: (1) intentionally and knowingly causing the death of Dahl by hitting Dahl with a deadly weapon—a hammer—or by inflicting blunt force trauma to Dahl with an unknown object, or (2) intending to cause serious bodily injury to Dahl and committing an act clearly dangerous to human life—hitting Dahl with a hammer or inflicting blunt force trauma to Dahl with an unknown object—which caused Dahl's death. *See* TEX. PENAL CODE § 19.02(b)(1)–(2).

"Serious bodily injury" is defined as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." TEX. PENAL CODE § 1.07(a)(46). Repeatedly hitting someone in the head with a hammer or inflicting blunt force trauma on a person with an unknown object reveals an intention to cause bodily injury that creates a substantial risk of death or that causes death. Here, Detective Willborn testified that a hammer was capable of causing serious bodily injury or death. We conclude this alternative theory was supported by the evidence and was "a theory which a reasonable mind could entertain." *See Almanza*,

–34–

686 S.W.2d at 173 (citation omitted). The trial court, therefore, did not err in submitting both theories to the jury as alleged by the State in its indictment and as supported by the evidence at trial.

Moreover, even assuming error, Lariostrejo was not harmed. Because Lariostrejo did not object to the jury charge, we review any charge error for egregious harm. *See Ngo*, 175 S.W.3d at 743–44. To constitute egregious harm, the error must affect the very basis of the case, deprive the accused of a valuable right, or vitally affect a defensive theory, such that the defendant "has not had a fair and impartial trial." *Almanza*, 686 S.W.2d at 171–72. Lariostrejo's defense at trial was he did not commit the murder, and his appellate argument concedes the evidence supports a finding this was an intentional and knowing murder of Dahl. Including an alternative theory of intent to cause serious bodily injury resulting in death did not vitally affect Lariostrejo's defensive theory that he was completely uninvolved in dealing the blows to Dahl's head.

Further, each of the two "alternatives for convicting appellant required the jury to be convinced beyond a reasonable doubt that appellant caused the death of the complainant." *Sanchez v. State*, 376 S.W.3d 767, 775 (Tex. Crim. App. 2012). We have already concluded the evidence sufficiently established Lariostrejo caused the death of Dahl regardless of whether his intent was to cause her death or to cause her serious bodily injury. Based upon our review of the entire record, we conclude

Lariostrejo was not egregiously harmed by the trial court's inclusion of the second manner and means instruction. We overrule Lariostrejo's second issue.

## III. Jury Charge Error – Instruction Concerning Extraneous Offense

In his third issue, Lariostrejo argues the trial court erred by including the following article 38.36(a) instruction alongside a limiting instruction:

> You are instructed that you may consider all relevant facts and circumstances surrounding the death, if any, and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense, if any.
>
> . . . .
>
> If there is evidence before you in this case alleging the Defendant committed an offense or offenses other than the offenses alleged against him in the indictments in this case, you are instructed that you cannot consider such evidence for any purpose unless you first find and believe beyond a reasonable doubt that the Defendant did commit such other alleged offense or offenses.
>
> You are instructed that evidence of crimes, wrongs, or acts other than what is alleged in the indictment is not admissible to prove the character of the Defendant in order to show action in conformity with that character, as proof he is guilty of the offenses charged in the indictments.
>
> It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, plan, identity, or absence of mistake or accident, or to refute a defensive theory, and even then you may only consider the same in determining the motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident of the defendant, or to refute the defensive theory, if any, in connection with the offense alleged against him in the indictment, and for no other purpose.

Lariostrejo argues the instructions in the first paragraph above concerned the relevance of his mistreatment of Dahl by referring to their previous relationship and

his state of mind. He maintains those instructions should not have been included in the charge because they conflicted with the limiting instruction regarding his alleged commission of extraneous offenses and confused the jury.

We disagree that including the first paragraph quoted above, which permitted the jury to consider Lariostrejo and Dahl's relationship and Lariostrejo's state of mind, conflicted with, or overrode, the extraneous offense limiting instruction. The prior relationship instruction is derived from article 38.36(a), which provides:

> In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

Tex. Code Crim. Proc. art. 36.38(a). Although an article 38.36 instruction is not mandatory, it is also not improper to give such an instruction. *Milner v. State*, 262 S.W.3d 807, 809 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *see also Fino v. State*, No. 05-17-00169-CR, 2018 WL 3829781, at *13 (Tex. App.—Dallas Aug. 13, 2018, pet. ref'd) (mem. op., not designated for publication) (citing *Milner* and explaining "[a]lthough it is permissible for the trial court to give an instruction, it is not mandatory"). In fact, an Article 38.36 instruction is traditionally included in the jury charge for the offense of murder. *Delgado v. State*, 635 S.W.3d 730, 746 (Tex. App.—Dallas 2021, pet. ref'd).

Lariostrejo asserts "[t]he true purpose of Art. 38.36 is to emphasize how a juror might determine the intent of the defendant and nothing else." He does not

offer any legal authority for this proposition. Instead, he contends there was no need for the instruction here because "[g]iven the means alleged—striking Dahl's head repeatedly with a hammer—there is no dispute about the attacker's intent." Lariostrejo's argument fails to recognize the purpose behind the two instructions. Although there is no limitation in article 38.36 as to how or for what purpose the jury may consider evidence of the parties' prior relationship when determining whether the defendant committed the offense, there are limits as to when a jury may consider extraneous offense evidence, which also may be offered to show the nature of the relationship between the accused and the deceased. *See* TEX. CODE CRIM. PROC. art. 36.38(a); *Garcia v. State*, 201 S.W.3d 695, 702–04 (Tex. Crim. App. 2006). Including an article 38.36 instruction in conjunction with a limiting instruction for any evidence admitted regarding extraneous offenses benefits the defendant as it further restricts how the jury can consider evidence about the parties' prior relationship.

Under this record, we conclude the trial court did not abuse its discretion in including an article 38.36 instruction along with an extraneous offense limiting instruction in the jury charge. We overrule Lariostrejo's third issue.

## IV.  Improper Jury Argument

In his fourth issue, Lariostrejo contends the trial court abused its discretion by sustaining the State's objection to part of his counsel's closing argument. The State objected to the following argument:

So the question is then, what -- what have you been presented that would establish that, that's the character of this guy? I mean -- you know how you sometimes meet people, and you, um, can see how genuine they are? You meet them, perhaps, at your place of worship. They -- they -- you see the goodness in them. You hang out with them. You saw that, that was – his circle of friends is from his place of worship. That's how you can tell this over time the genuineness of a person.

I mean, did they present something to you that made you feel like he is a violent person?

[THE STATE]: Judge, I'm going to object. This is an improper argument, arguing about character evidence.

THE COURT: Sustained.

Ladies and gentlemen, you have heard all the evidence and testimony in this case. You will refer to any information and testimony that you heard from the witness stand. The arguments of either side from Counsel is not evidence. You may proceed.

On appeal, Lariostrejo argues the trial court's ruling left the jury "with only the allegations against Lariostrejo but prevented Lariostrejo from rebutting those allegations with proper argument or evidence" and deprived him of a substantial right. We disagree.

We review the trial court's ruling on the State's objection to a defendant's jury argument for abuse of discretion. *Castignanie v. State*, No. 05-22-01055-CR, 2023 WL 5274036, at *1–2 (Tex. App.—Dallas Aug. 16, 2023, no pet.) (mem. op., not designated for publication) (citing *Davis v. State*, 329 S.W.3d 798, 825 (Tex. Crim. App. 2010) (holding trial court "did not abuse its discretion in sustaining the [S]tate's objection to" appellant's counsel's jury argument)). A trial court has broad discretion in controlling the scope of closing argument but may not prevent defense

counsel from making a point essential to the defense. *Wilson v. State*, 473 S.W.3d 889, 902 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (citing *Lemos v. State*, 130 S.W.3d 888, 892 (Tex. App.—El Paso 2004, no pet.)).

If the argument is one the defendant is entitled to make, improper denial of jury argument may constitute a denial of the right to counsel. *Davis*, 329 S.W.3d at 825 ("Although we have held that improper denial of a jury argument may constitute a denial of the right to counsel, this holding assumes that the jury argument is one the defendant is entitled to make."); *see McGee v. State*, 774 S.W.2d 229, 238 (Tex. Crim. App. 1989) (same); *Riles v. State*, 595 S.W.2d 858, 861 (Tex. Crim. App. 1980) ("[I]mproper denial of jury argument can constitute a denial of the right to counsel."). Because such error *may* constitute a denial of the right to counsel, the error is constitutional error subject to harm analysis under Texas Rule of Appellate Procedure 44.2(a). *Castignanie*, 2023 WL 5274036, at * 2. Under Rule 44.2(a), we are required to reverse a judgment of conviction or punishment unless we determine beyond a reasonable doubt the error did not contribute to the conviction or punishment. *Id.* (first citing *Vasquez v. State*, 484 S.W.3d 526, 532 (Tex. App.— Houston [1st Dist.] 2016, no pet.); and then citing TEX. R. APP. P. 44.2(a)). In applying the "harmless error" test, the primary question is whether there is a "reasonable possibility" that the error might have contributed to the conviction. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).

Here, even if we assume the trial court erred in sustaining the State's objection and assume the argument was one Lariostrejo was entitled to make, we conclude beyond a reasonable doubt the error did not contribute to Lariostrejo's conviction. The State made its objection after Lariostrejo's trial counsel made his argument to the jury that the State did not present the jury with any evidence of Lariostrejo's character or show he had a violent nature. However, the trial court merely sustained the State's objection; it did not instruct the jury to disregard the argument. The jury was, thus, entitled to remember and consider the evidence presented during trial without limitation and consider counsel's arguments as argument, not evidence. Under this record, we conclude any error in sustaining the State's objection was harmless. *See Wilson v. State*, 473 S.W.3d 889, 902–03 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (holding any error committed by the trial court in sustaining the State's objections to the pertinent portions of the closing argument of the defendant's trial counsel was harmless because the trial court did not instruct the jury to disregard the argument). We overrule Lariostrejo's fourth issue.

## V.    Speedy Trial

In his fifth issue, Lariostrejo contends the State violated his right to a speedy trial. He seeks reversal and remand with instructions to grant his speedy trial motion and dismiss the indictment. We overrule this issue.

### A. Standard of Review

We apply a bifurcated standard of review in a speedy trial analysis: we employ an abuse of discretion standard for the factual components and a de novo standard for the legal components. *State v. Lopez*, 631 S.W.3d 107, 113–14 (Tex. Crim. App. 2021). Thus, we give almost total deference to the trial court's historical findings of fact that are supported by the record. *Gonzales v. State*, 435 S.W.3d 801, 808 (Tex. Crim. App. 2014). Initial triggering of the speedy trial issue, as well as the balancing test of the *Barker*[8] factors, are purely legal questions that we review de novo. *Id.*

### B. The *Barker* Factors

The Sixth Amendment to the U.S. Constitution guarantees the accused in a criminal prosecution the right to a speedy trial. *See* U.S. CONST. amend. VI. This right attaches once a person is either arrested or charged. *Cantu v. State*, 253 S.W.3d 273, 281 (Tex. Crim. App. 2008). Courts determine a speedy trial claim on an ad hoc basis by analyzing and weighing four factors: (1) the length of the delay, (2) the State's reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) prejudice to the defendant because of the length of delay. *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *Cantu*, 253 S.W.3d at 280. The State has the burden to justify the length of the delay, while the defendant has the burden to prove that he asserted his right and has been prejudiced by the State's delay. *Cantu*, 253

---

[8] *Barker v. Wingo*, 407 U.S. 514, 530 (1972) (setting out the four factors courts must analyze and weigh when determining a speedy trial claim).

S.W.3d at 280. We address each factor and perform the required balancing test below.

### 1.     Presumptive prejudice and length of delay

To trigger a speedy trial analysis, the defendant must make an initial showing that "the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay." *Cantu*, 253 S.W.3d at 280 (quoting *Doggett v. United States*, 505 U.S. 647, 651–52 (1992)); *see also Barker*, 407 U.S. at 530–32 (holding that length of delay is "triggering mechanism" for analysis of other factors). There is no set or defined period of time that has been held to be a per se violation of a defendant's right to a speedy trial under the Sixth Amendment. *Barker*, 407 U.S. at 529–30; *Cantu*, 253 S.W.3d at 281. Texas courts have generally considered delay approaching one year to be "unreasonable enough to trigger the *Barker* inquiry." *See Balderas v. State*, 517 S.W.3d 756, 768 (Tex. Crim. App. 2016). But this Court has repeatedly held we must determine whether a *Barker* analysis is triggered on a case-by-case basis, without imposing rigid time limitations. *Munoz v. State*, No. 05-20-00192-CR, 2021 WL 2253245, at *6 (Tex. App.—Dallas June 3, 2021, pet. ref'd) (mem. op., not designated for publication) (citing *State v. Page*, No. 05-18-01391-CR, 2020 WL 1899453, at *5 (Tex. App.—Dallas April 17, 2020, no pet.) (mem. op., not designated for publication)).

Here, Lariostrejo's right to a speedy trial attached on December 15, 2019, when he turned himself into police and was taken into custody. *See Cantu*, 253

S.W.3d at 280 (right attaches once a person becomes an "accused" by being arrested or charged). Lariostrejo filed a motion entitled "Defendant's Speedy Trial Demand" on July 20, 2021. He then filed a "Motion to dismiss for Speedy Trial Violation" on August 9, 2021. The matter was set for a hearing on August 10, 2021. His trial began June 13, 2022, approximately two years and sixth months after his arrest. The State did not contest that the twenty-month delay between Lariostrejo's arrest on December 15, 2019, and his speedy trial hearing on August 10, 2021, was sufficient to trigger a full *Barker* analysis. We agree that, in this case, the length of time between arrest and trial supports our addressing the three remaining *Barker* factors. *See*, *e.g.*, *State v. Conatser*, 645 S.W.3d 925, 929 (Tex. App.—Dallas 2022, no pet.) (State did not contest that two-year delay was sufficient to trigger *Barker* analysis).

### 2.    Reasons for the delay

We do not attribute equal weight to all reasons for delay: an intentional delay for tactical reasons is weighed heavily against the State; a neutral reason, such as overcrowded courts or negligence, is weighed less heavily against the State; and a valid reason is not weighed against the State at all. *State v. Munoz*, 991 S.W.2d 818, 822 (Tex. Crim. App. 1999). The timeline of this case can be divided into several distinct segments, and we will review the weight attributed to each segment individually.

### a. December 15, 2019 – March 19, 2020 (3 months, 5 days)

Lariostrejo was arrested on December 15, 2019, and indicted on February 13, 2020. Lariostrejo's first setting was scheduled for March 5, 2020, and he and his counsel agreed to reset the first appearance to March 19, 2020. This is an expected and acceptable delay. *See Shaw v. State*, 117 S.W.3d 883, 889–90 (Tex. Crim. App. 2003) (determining that the initial three months it took to charge an appellant could not be counted against the State "since the State was entitled to a reasonable period in which to prepare its case"). Accordingly, this time does not weigh against the State.

### b. March 20, 2020 – July 15, 2021 (16 months)

After Lariostrejo was charged, another sixteen months passed due to the COVID-19 pandemic and its accompanying limitations on the entire judicial system. All jury trials were suspended[9] until July 2021, and no pass slips were signed during this time. "Delay caused by the onset of a pandemic cannot be attributed as fault to the State." *State v. Conatser*, 645 S.W.3d 925, 930 (Tex. App.—Dallas 2022, no pet.). Therefore, we hold this period does not weigh against the State.

---

[9] On March 13, 2020, Texas Governor Greg Abbott issued a proclamation under the Texas Disaster Act of 1975 certifying that "COVID-19 poses an imminent threat of disaster" in all 254 Texas counties; he renewed that declaration in successive months. The Governor of the State of Tex., Proclamation No. 41-3720, 45 Tex. Reg. 2087, 2095 (2020). The same day, the Texas Supreme Court issued its first order that "subject only to constitutional limitations," all courts were required to modify their procedures to avoid the risk to court staff, parties, attorneys, jurors, and the public. *First Emergency Ord. Regarding COVID-19 State of Disaster*, 596 S.W.3d 265 (Tex. 2020).

c.     July 16, 2021  October 25, 2021 (3 months, 10 days)

In July 2021, the criminal courts in Dallas County began holding jury trials. On July 15, 2021, Lariostrejo signed a pass slip agreeing to reset the case to July 22, 2021. Lariostrejo filed his speedy trial demand on July 20, 2021, and on July 22, 2021, agreed to reset the case to August 10, 2021 for a speedy trial hearing. On August 9, 2021, Lariostrejo filed his "Motion to Dismiss for Speedy Trial Violation." At the speedy trial hearing, the trial court recognized the need to set the case for trial, but also told the parties that the pandemic shutdown and the Texas Supreme Court's pandemic-related orders had caused a backlog of cases and older cases would take precedence over this case. The trial court nonetheless denied Lariostrejo's motion to dismiss and set the case for trial on October 25, 2021. Because Lariostrejo agreed to the resets during this time period, this time does not weigh against the State. *See*, *e.g.*, *Lu v. State*, No. 05-22-00235-CR, 2023 WL 3735235, at *4 (Tex. App.—Dallas May 31, 2023, no pet.) (mem. op., not designated for publication) (time period in which the defendant agreed to resets did not weigh against the State); *see also Hogenson v. State*, No. 05-14-00981-CR, 2015 WL 3900352, at *3 (Tex. App.—Dallas June 25, 2015, no pet.) (mem. op., not designated for publication) (citing *Celestine v. State*, 356 S.W.3d 502, 507 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding the months of delay the defendant agreed to cannot be counted against the State)).

> d. October 26, 2021 – June 13, 2022 (7 months, 19 days)

On October 18, 2021, the trial court rescheduled the trial to March 2, 2022. A docket sheet entry shows the court would be in trial on another case on October 25, 2021, and was resetting Lariostrejo's case to the next available trial date. On February 10, 2022, Lariostrejo agreed to reset his trial to June 20, 2022. On March 18, 2022, the trial court moved the trial date to June 13, 2022, as a special setting. The case was tried to a jury from June 13, 2022, through June 17, 2022. A crowded court docket is not a valid excuse and weighs against the State, but not heavily. *See Shaw*, 117 S.W.3d at 890.

Although thirty months transpired between Lariostrejo's arrest and his trial, less than eight months—where the trial was rescheduled due to an overcrowded court docket—weigh against the State, but not heavily. Further, there is no evidence the State deliberately delayed Lariostrejo's trial for strategic gain. We, therefore, find the second *Barker* factor weighs only slightly against the State. *See Conatser*, 645 S.W.3d at 930.

### 3. Lariostrejo's assertion of the right to a speedy trial

The third *Barker* factor examines the defendant's assertion of his right to a speedy trial. Lariostrejo's assertion of his right should receive "strong evidentiary weight" in our determination of whether he has been deprived of that right. *See Balderas*, 517 S.W.3d at 771. If a defendant does not timely demand a speedy trial, we must assume that he did not really want one. *Id.* And the longer the delay before

trial, the more likely it would be that a defendant wanting a speedy trial would request it. *Id.*

Here, Lariostrejo filed is speedy trial demand nearly eighteen months after his arrest, and a motion to dismiss three weeks later. We conclude the third *Barker* factor weighs against Lariostrejo. *See*, *e.g.*, *Lu*, 2023 WL 3735235, at *5 (concluding third *Barker* factor weighed against appellant where she first raised the issue of a speedy trial 18 months after her arrest and two months later requested a dismissal).

### 4. Prejudice caused by delay

Lariostrejo bore the burden of showing he was prejudiced by the delay in this case. *Cantu*, 253 S.W.3d at 280 ("the defendant has the burden of proving the assertion of the right and showing prejudice") (footnotes omitted). We assess this prejudice considering the interests that the speedy trial right attempts to protect: preventing oppressive pretrial incarceration, minimizing anxiety and concerns of the accused, and limiting the possibility that the defense will be impaired. *State v. Munoz*, 991 S.W.2d 818, 826 (Tex. Crim. App. 1999). The most serious of these is the last "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532. Thus, prejudice is obvious if witnesses became unavailable due to the delay. *Id.*

At the speedy trial hearing, Lariostrejo's counsel told the court that Lariostrejo was currently being quarantined for COVID and had been incarcerated for twenty months. Counsel argued that he believes it is "a bit of an understatement" to say the

delay has prejudiced Lariostrejo. When asked to explain how the delay had prejudiced Lariostrejo, counsel responded that Lariostrejo had been unable to work while incarcerated, his relationships with family and friends had deteriorated, and being incarcerated for 600 days had caused him anxiety and stress.

Evidence of generalized concern or anxiety, although relevant, is not sufficient proof of prejudice under the *Barker* analysis. *Cantu*, 253 S.W.3d at 286. Here, Lariostrejo offered no evidence that his defense was hampered in any way by the loss of witnesses. Rather, his counsel argued prejudice based on only general concern or anxiety. Under this record, we conclude Lariostrejo has failed to establish that he was prejudiced by any delay caused by the State in this proceeding. This factor weighs heavily against him.

### C.     Balancing the *Barker* Factors

Having assigned weight to the four *Barker* factors, we must balance their relative weights in light of the conduct of both parties. *Cantu*, 253 S.W.3d at 281. Here, the majority of time between Lariostrejo's arrest and trial cannot be attributed to the State. Moreover, Lariostrejo's speedy trial demand came nearly eighteen months after his arrest, and he has failed to show prejudice caused by the delay. Under this record, we conclude Lariostrejo failed to establish a violation of the right to a speedy trial. We overrule his fifth issue.

## VI. Admission of Prior Inconsistent Statement

In his final issue, Lariostrejo challenges the admission of State's Exhibit 192 to impeach J.F. with a prior inconsistent statement. The testimony concerned whether J.F. saw tape around Dahl's bedroom door. We review the admission of evidence for an abuse of discretion. *Oprean v. State*, 201 S.W.3d 724, 726 (Tex. Crim. App. 2006). Unless the trial judge's decision was outside the "zone of reasonable disagreement," an appellate court should uphold the ruling. *Id.*

During the State's direct examination of J.F., he testified that when he and Lariostrejo were painting the house, Lariostrejo told him the house smelled bad because Dahl left spoiled food in her room, and Lariostrejo was going to tape up her bedroom door to keep the smell out of the house:

> Q. Do you recall going over to -- to the home and observing tape on one of the roommates's doors?
>
> A. I believe that's what I said. But what I think I wanted to say is that we were going to put tape. Carlos said that to me.
>
> Q. Okay. So back on December 30th, when you spoke to those officers, do you remember telling them:
>
>> "When you were at his house, did you see anything out of place or in his room?"
>>
>> And your response: "The woman had gone out of town, and he said something expired from the food and had to close it from stinking up the entire house."
>
> Do you remember saying that?
>
> A. Yes.

–50–

Q. Do you remember telling the police that the food from the woman -- or did he tell you what was stinking up the house?

A. What was the question?

Q. Did he tell you exactly what was stinking up the house?

A. He told me spoiled food.

Q. And when you were there, at some point, you saw tape on the woman's door; is that right?

A. I don't think there was tape, but I – I remember him telling me that he was going to.

Q. So you're telling us that Carlos told you he was going to tape the house -- or tape the door?

A. Yes.

Q. Okay. And do you remember when he told you that?

A. He told me that when we were painting the house. I was helping Carlos paint the house, and we were putting tape on the roof and then in the corners, stuff that we didn't want to get paint on, and also the lady's room because we didn't want the -- the smell of the paint to be strong and get into the -- into the lady's room.

***

Q. And you're telling us now that when you were there, her door was not taped, correct, initially?

A. Yes.

Q. Okay. And you taped it because you were going to paint the house?

A. I didn't -- no, I didn't tape it. But we taped the -- the walls.

Q. Did you -- who taped her door?

A. I don't know.

Q. Did you ever see tape on her door?

A. No.

Q. Are you sure?

A. Yes.

\*\*\*

Q. So when you were over there, you're telling us that he told you the woman had gone out of town and some food expired; right?

A. Yes.

Q. Okay. So you're at the house. The house smells to you or to Carlos?

A. I think it was me because when you're in the room, it stinked -- it smelled -- I just barely walked in the house, and I smelled it.

Q. Okay. Did you actually mention it to Carlos, that it smelled?

A. Yes.

Q. Okay.

A. He agreed that it smelled, too, because he smelled it.

Q. But the smell you-all identified, you're telling us, was of some expired food from Kristina; is that right?

A. Yes.

Q. And her door wasn't taped. So did you just not think to go in there and get the food out?

A. The door was locked. Every time she would go out of town, she would lock her door, so we couldn't go in there.

\*\*\*

Q. Okay. So, Jason, going back to your statement to Detective Willborn, Farmers Branch Police Department, December 30th, 2019, you're telling the jury that you -- when asked, "Was there tape on the door when you were there," you did not say, "Yeah, it was already on before I got there"?

A. I think I believed to say it was -- that Carlos was going to put tape on -- this was, like, two years ago. I can't really remember.

The State offered a portion of State's Exhibit 192, which was J.F.'s recorded statement to the FBPD on December 30, 2019, for impeachment purposes:

> THE STATE: And at this point, [J.F.] has denied making statements to the Farmer's Branch Police Department. And so, I've given him an opportunity to review the time, the date and the location of those statements. He has denied making that statement. And so I do ask now to publish that statement that he did make, marked as State Exhibit 192 with the time stamp between eight minutes and nine minutes.
>
> We have a right to impeach this witness based on a prior inconsistent statement.
>
> DEFENSE COUNSEL: We'd like a hearing on this, Judge.

Outside the presence of the jury, Lariostrejo's counsel objected to admission of the evidence based on hearsay. The State responded that it was offering the evidence "to impeach the witness based on his own prior inconsistent statement. I'm not offering it for the truth of the matter asserted. I'm offering it to show that he made an inconsistent statement different than the one he's telling the jury this afternoon." The trial court overruled the objection and allowed the statement to be admitted "in regards to prior inconsistent statements."

After the jury returned to the courtroom, the State played a fifty-five second video excerpt from a police interview of J.F. at his home on December 30, 2019, in which the following was stated:

> Det. Willborn: OK. When you were over at his house, did you see anything out of place that was not normally there?
>
> J.F.: Mmmmm.
>
> Det. Willborn: You were in his room?

J.F.: Oh wait. Actually. So like the woman had gone out of town [inaudible]

Det. Willborn: Uh, one of the roommates?

J.F.: Yeah.

Det. Willborn: OK. Because I think there was two people who live there.

J.F.: Yeah. Something, something expired, for food there. [Inaudible] He had to close it because it was stinking up the whole house.[Inaudible]

Det. Willborn: The food. Something had expired there?

J.F.: Yeah.

Detective #2: What did he tell you?

J.F.: He told me it was food from the woman because she would take medicine.

Det. Willborn: And so the house stunk?

J.F.: Yeah.

Det. Willborn: And so was, there was tape up on the door when you were there?

J.F.: Mm, yeah.

Det. Willborn: OK. Did you help him put the tape up?

J.F.: No. It was – he already put it on before I came.

After playing the video, the State questioned J.F. as follows:

Q. All right, [J.F.]. Does it appear you told those officers that when you got to Carlos's home, there was tape already on the door?

A. In the video, I think, yes.

Q. Okay. You also said when referring to Christina's room, "Something expired from the food and had to close it."

–54–

Are you referring to her door, by chance?

A. No, the tape. Just seal the room so it can't stink.

Q. "Something expired from the food and had to close it. It was stinking up the entire house."

You're telling us you're referring to tape?

A. Yes.

Q. So was tape on the door or not?

A. I think, yes.

***

Q. The evidence, whose room is with this silver tape on it?

A. If I remember, I think that's Dahl's -- Ms. Dahl's room.

Q. Okay. And when Carlos is telling you the smell from that room because of expired food and she's out of town, this is the room you're talking about?

A. Yes.

Q. Okay. Is that the tape that you're now telling the jury that you do recall seeing at the house?

A. Yes, now I remember it.

On appeal, Lariostrejo contends the State impermissibly used the prior statement to refresh J.F.'s recollection and to bolster the State's case. We disagree.

In the video, J.F. told Detective Willborn he saw tape around Dahl's bedroom door when he was at Lariostrejo's house. But at trial, he testified that he was sure he had not seen tape on the door. Instead, he recalled Lariostrejo saying he was going to put tape on the door. J.F.'s statement on the video is a prior inconsistent statement, and the State laid the proper predicate to use the statement to impeach J.F. The trial

court, therefore, did not abuse its discretion overruling Lariostrejo's hearsay objection and admitting the video excerpt. *See* TEX. R. EVID. 613(a); *see also McGary v. State*, 750 S.W.2d 782, 786 & n.3 (Tex. Crim. App. 1988) (en banc) (if the admission is partial, qualified, or otherwise equivocal, or if the witness claims to not remember making the prior statement, then the statement is admissible for impeachment purposes); *Ruth v. State*, 167 S.W.3d 560, 566 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (same).

Moreover, any alleged error in admitting the statement was harmless because evidence that Dahl's door had tape around it sometime after December 7, 2019, was admitted without objection through several other witnesses, including Munguia, Reddy, and Rios. "[O]verruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling." *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998).

Lariostrejo also argues admission of the video was harmful because the trial court did not instruct the jury to limit its consideration of the exhibit. He did not, however, preserve this complaint for appeal. *See Pardue v. State*, 252 S.W.3d 690, 698 (Tex. App.—Texarkana 2008, no pet.) (holding that because the defendant failed to request a limiting instruction at the time the exhibit was admitted, he could not complain about its admission for all purposes on appeal). The party seeking to limit the purpose for which evidence can be considered has the burden to request that the jury be given a limiting instruction. *Arana v. State*, 1 S.W.3d 824, 829 (Tex.

–56–

App.—Houston [14th Dist.] 1999, pet. ref'd); TEX. R. EVID. 105(a) ("When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly; but, in the absence of such request the court's action in admitting such evidence without limitation shall not be a ground for complaint on appeal"). Once evidence is admitted without a proper limiting instruction, it becomes part of the general evidence in the case and may be considered for all purposes. *Delgado v. State*, 235 S.W.3d 244, 251 (Tex. Crim. App. 2007); *Arana*, 1 S.W.3d at 829. Here, Lariostrejo did not request an instruction at the time it was admitted limiting the jury's consideration of J.F.'s prior statement to impeachment. Accordingly, he failed to preserve this complaint for appeal, and the jury could consider the evidence for all purposes. *See Delgado*, 235 S.W.3d at 251; *see also Pardue*, 252 S.W.3d at 698; *Arana*, 1 S.W.3d at 829.

For these reasons, for overrule Lariostrejo's final issue.

## CONCLUSION

Under this record, we find no reversible error and overrule each of Lariostrejo's appellate issues. Accordingly, we affirm the trial court's judgment.

220701f.u05
Do Not Publish                                      /Robbie Partida-Kipness/
TEX. R. APP. P. 47.2(b)                      ROBBIE PARTIDA-KIPNESS
                                                       JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

CARLOS RAUL LARIOSTREJO, Appellant

No. 05-22-00701-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 203rd Judicial District Court, Dallas County, Texas Trial Court Cause No. F-1922702-P. Opinion delivered by Justice Partida-Kipness. Justices Reichek and Carlyle participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 2nd day of December, 2024.